**Theodore ECONOMOU, et al.,**
**Plaintiffs,**

v.

**PHYSICIANS WEIGHT LOSS CENTERS OF AMERICA, et al., Defendants.**

**No. 90–CV–1777.**

United States District Court,
N.D. Ohio, E.D.

Feb. 12, 1991.

David N. Brown, Brown, Amodio & Warrell, Medina, Ohio, for plaintiffs.

Jeffrey J. Keyes, Briggs & Morgan, Minneapolis, Minn., James J. Long, Briggs & Morgan, St. Paul, Minn., Richard E. Gus-

ter, Thompson, Hine & Flory, Akron, Ohio, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SAM H. BELL, District Judge.

Currently before the court are cross-motions for preliminary injunction filed by plaintiffs Theodore Economou, Maureen Economou, Steven Streit, and Nancy Streit (hereinafter plaintiffs) and defendants Physicians Weight Loss Centers of America, Inc. (hereinafter PWLC when referred to individually) and Charles E. Sekeres (hereinafter defendants). In their motion, plaintiffs seek an order enjoining defendants from enforcing certain contractual covenants not to compete. By contrast, defendants in their motion seek an order enforcing the very same covenants. A two-day hearing was held on December 5th and 6th, 1990, during which the parties submitted evidence and testimony in support of their respective positions. On January 11, 1990, the parties submitted proposed Findings of Fact and Conclusions of Law.

## I. FINDINGS OF FACT

1. PWLC is a national franchiser of Physicians Weight Loss Centers and commenced operations in 1979. It is an Ohio corporation with its principal place of business in Akron, Ohio.

2. Charles E. Sekeres is an Ohio resident and is the founder, sole shareholder, director, and president of PWLC. Sekeres worked in the health club industry for many years before forming PWLC and garnered most of his knowledge of and experience with the diet industry during these early years.

3. The plaintiffs are all residents of New Jersey and were franchisees of PWLC from 1986 to 1990. They operated four PWLC centers in Freehold, East Brunswick, Princeton, and Wayne, New Jersey.

4. The plaintiffs first investigated the possibility of becoming PWLC franchisees in 1986. Ted Economou had no prior experience in the weight loss business (Economou testimony at 118); Steven Streit is a medical doctor with a specialty in internal medicine who had conducted a general practice (Economou testimony at 177). Plaintiffs contacted PWLC and, after some discussion, decided to become franchisees. PWLC sent plaintiffs a packet of franchise materials which contained the following representations:

Fast, safe and effective weight loss;

Guaranteed weight loss of 3–7 pounds per week;

Medically proven maintenance program to keep weight off forever;

The operating overhead is low, profit margin is high and break even point easily achievable.

The franchisor supports all franchisees with the following:

a dynamic sales and marketing force;

a thorough franchise development team
 a. center design
 b. site location
 c. planning and budgeting
 d. effective advertising
 e. assistance with lease negotiation

a staff of experienced, professional service representatives

a comprehensive training and education development department
 a. two and a half weeks of initial training
 b. ongoing owners seminars
 c. monthly general training seminars
 d. semi-annual sales seminars
 e. ongoing management/director seminars
 f. sales college to improve sales strategies on a college level

a national advertising coordinator

a planning and budgeting committee

a full-service warehousing and distribution system

a national medical operations director

"How–To" manuals for every phase of operations

Toll Free Hot Line.

Plaintiffs Exhibit 11; Economou testimony at 202–205.

5. In the spring of 1986, plaintiffs were approved as franchisees. On May 8, 1986,

plaintiffs signed a franchise agreement for a PWLC center in Freehold, New Jersey, and commenced operation of the center on June 15, 1987. Plaintiffs paid a $12,500 franchise fee for this center. Economou testimony at 125. On September 16, 1986, plaintiffs signed a franchise agreement for a center in East Brunswick, New Jersey, and commenced operation of the center on that day. Plaintiffs purchased this center for $40,000.

6. These first two centers initially met with success. In 1986, based upon three months operation at the East Brunswick center, plaintiffs acquired gross revenues of $63,492 and enrolled 107 clients. Defendants' Exhibit 27. In 1987, based upon a full year of operation at East Brunswick and six months of operation at Freehold, plaintiffs earned gross revenues of $600,-396 and enrolled 975 clients. Defendants' Exhibit 28. In addition, Economou testified that Freehold was a successful center in 1987 and that, during first two years of operation, plaintiffs had a "very good relationship" with PWLC and that, financially, plaintiffs were "doing well." Economou testimony at 136, 174–175.

7. On November 10, 1987, plaintiffs and PWLC executed a third franchise agreement for a center in Princeton, New Jersey. Plaintiffs purchased a condominium site for this center for $300,000. For the year 1988, based upon a full year of operations at East Brunswick and Freehold and four months' operation at Princeton, plaintiffs had gross sales of $1,206,366 and enrolled 1591 clients. Defendants' Exhibit 29. The East Brunswick, Princeton, and Freehold centers all won numerous awards. Economou testimony at 163.

8. The plaintiffs signed a fourth franchise agreement for a center in Wayne, New Jersey on March 3, 1989, and commenced operation of the center on that day. For 1989, based upon a full year's operation at East Brunswick, Freehold, and Princeton, and nine months at Wayne, plaintiffs' gross revenues were $1,313,619, and client enrollment reached 1443. Defendants' exhibit 30.

9. A case flow analysis of plaintiffs' business from 1986–1989 presented by Clifford Kocien, Executive Vice President of PWLC and certified public accountant, shows that the cash flow profit for 1986 was $9,488; for 1987, $93,786; for 1988, $152,099; and for 1989, $111,484. Defendants' Exhibits 27–30; Kocien testimony at 344–349.

10. In September of 1989, plaintiffs renewed their expired East Brunswick franchise agreement for an additional six months. Economou testimony at 186–187. In December of 1989, Ted Economou noticed a "drastic" decrease in sales volume for his centers. Economou testimony at 151.

11. Sometime in 1990, due to financial distress, plaintiffs closed the Princeton and Wayne centers. PWLC had a contractual right of assignment under these centers, but declined to exercise this right. Economou testimony at 157. Subsequently and also in 1990, plaintiffs closed the Freehold and East Brunswick sites. The Freehold agreement was terminated by PWLC after plaintiffs failed to make royalty payments.

12. Plaintiffs attribute their financial problems to a "Dieter's Information Sheet," to PWLC's change in its diet program in 1989, and to PWLC's failure to provide support during the troubled economic times in late 1989 and 1990. With regard to the first contention, the diet utilized by PWLC franchisees from 1980 to November, 1989, was a 700 calorie diet known as a "very low caloric diet." In response to a report which questioned the medical safety of the very low caloric diet, PWLC in January of 1989 produced and distributed a Dieter's Information sheet to be presented to clients upon enrollment. The information sheet warned about certain risks associated with the PWLC diet: lower body temperatures, mild temporary hair loss, irregular menstrual cycles, the possibility of bruising more easily, and lightheadedness or fainting while running or swimming. Plaintiffs' Exhibit 10. Prior to 1989, franchisees had been warned about these very same risks in education programs. Kocien testimony at 362–64.

13. The motion hearing produced no evidence that the very low caloric diet actually produced complaints from or injuries to any clients. Further, while the testimony of Robert Ligon[1] indicated that the information sheet caused a decrease in sales and client volume for 1989, (Ligon testimony at 32–34), there was little if any evidence that it caused the decrease in *plaintiffs'* business. In other words, while plaintiffs' cash flow profit decreased approximately $40,000 in 1989 from that in 1988, and client enrollment decreased from 1591 to 1443, there is no evidence of a causal connection between these decreases and the information sheet.

14. Plaintiffs' primary contention is that PWLC's September, 1989 diet change caused their financial difficulties. In September, 1989, at its annual convention, PWLC announced that it would introduce a new 900 caloric diet which has been termed a "low caloric diet." The diet was introduced in November of 1989 and was described to franchisees as a low-fat, high-fiber, low-caloric diet. Ligon testimony at 36, Sekeres testimony at 257. Plaintiffs' franchise agreements permits PWLC to make changes in diets and provide in part as follows:

> Franchisor reserves the right to modify or change the System, Marks, the various training programs offered to Franchisees and their employees, and the Manuals at any time, and from time-to-time by the addition, deletion or other modification to the provisions thereof, and such modification shall be made in the sole judgment of Franchisor to protect Franchisor Marks and goodwill, to comply with any applicable law, statutes or judicial or administrative decision, or to improve the quality of services, training or products offered.

Defendants' Exhibits 20–22.

15. The new diet did, however, decrease PWLC's weight loss guarantee. Originally, under the very low caloric diet, PWLC advertised a five to seven pound weekly loss. This guarantee was gradually reduced to a low of two pounds per week on July 2, 1990. Sekeres testimony at 264–65. The new diet also modified certain medical components (*i.e.*, potassium supplements and use of ketosticks to measure ketosis level were no longer used) and was more complicated. Ligon testimony at 38–39.

16. While the Dieter's Information Sheet appears not to have led to plaintiffs' decreased sales and client volume, the change in diets and the gradual decrease in weight loss guarantee led to client dissatisfaction for plaintiffs in late 1989. Economou testimony at 145–46. A "drastic" decrease in sales volume for plaintiffs' centers occurred in December of 1989 as a result of the diet change. Economou testimony at 150–51.

17. Plaintiffs' third contention in support of their breach of contract claim is that PWLC failed to provide franchisor support when plaintiffs' economic problems were manifested in December of 1989. At this time, Economou telephoned Kocien in "near panic" concerning the decrease in sales volume of his centers. Economou testimony at 151. Kocien told Economou to send his financial statements for the centers to PWLC for Kocien to review. Economou did as directed, but Kocien failed to respond. Economou testimony at 152. Kocien did, however, given plaintiffs $12,500 worth of products on credit without receiving compensation. Economou testimony at 195. In addition, Economou testified that Anita Heisler, PWLC service representative, gave plaintiffs the best assistance she could by way of support services in 1989 and 1990. Economou testimony at 196.

18. Upon closing their PWLC centers, Economou and Streit commenced operation of a business called "Health Options." The business is run by the Baron Agency, a company which markets employee health insurance benefit packages to corporations. Economou testimony at 159. The employee benefit program provides health options to

---

**1.** The hearing was consolidated to include both this case and a pending motion for preliminary injunction in *Physicians Weight Loss Centers of America v. Ligon,* case no. 90–CV–1133. Robert Ligon's testimony, for the most part, was pertinent only to this latter case.

provide assistance with personal stress, personal fitness, reduction in smoking, and weight reduction. Economou testimony at 160.

19. A portion of the Health Options business is retail and is operated in Freehold and New Brunswick. The weight reduction portion of the program involves physician's exams, ongoing supervision, and utilizes a 1,000 calorie diet. Economou testimony at 190. Some former PWLC clients have switched to the Health Options program. *Id.*

20. Economou gave conflicting testimony regarding the necessity of the weight loss component of the Health Options program. He testified that this component is just one facet of the program and that "it may not even be used. We have one company who will not even use it." Economou testimony at 160. On the other hand, he also declared that "it appears it would not be able to go forward without a weight loss portion of the program." Economou testimony at 191.

21. The Freehold and New Brunswick franchise agreements included the following covenants not to compete:

C. Covenant not to compete: Franchisee agrees that during the term of this Agreement, it shall not be associated, directly or indirectly, as employee, proprietor, stockholder, partner, agent, or officer with the operation of any business competitive with Franchisor. This shall include the operation of any type of business offering diet weight control or exercise services or selling diet and weight control products. This restriction applies to operation (a) within the Area, or (b) within fifty (50) miles from any location from which Franchisor or Franchisees of Franchisor operate. The foregoing restrictions (a) and (b) are distinct and severable.

For a period of one (1) year after the termination, or the transfer or other disposition of this franchise, it will not so compete as aforesaid in, or within fifty (50) miles of the "Approved Location," but if Franchisee does so compete (whether by reason of the unenforceabili-

ty of such covenant not to so compete or otherwise), Franchisee shall pay Franchisor royalties in the manner and amount set forth in Section VIII and Paragraph (A) hereof with respect to those revenues, if any, derived by Franchisee from its operation of a weight loss and weight control business within said fifty (50) mile limit, such payments to continue for one (1) year or for the balance of the then existing term (whether initial or renewal) of this Agreement, whichever is longer. The parties expressly acknowledge and agree that such payments shall not affect any rights or remedies Franchisor may have, at law or in equity (including the right to seek injunctive relief), against Franchisee by reason of such competition by Franchisee.

East Brunswick agreement, section XC, Defendants' Exhibit 20.

(A) During the term of this Agreement and for a period of three (3) years thereafter, Franchisee and the affiliates of Franchisee executing this Agreement (hereinafter referred to as "Franchisee") shall not, within a fifty (50) mile radius of the geographical center of the Territory, or within a fifty (50) mile radius of any other Physicians WEIGHT LOSS Centers location, whether owned by Franchisor (including any affiliate of Franchisor) or a franchisee, which is (1) to the knowledge of Franchisee leased, contracted for, franchised or under construction, or (2) established or in operation at any time during the term of this Agreement, in any capacity, directly or indirectly, except with the written consent of the Franchisor, or, if applicable, the Franchisee so affected, and/or as expressly permitted by the terms of this Agreement:

. . . . .

(2) engage in business competitive with that covered by the franchise which is the subject of this Agreement, including but not limited to diet control and weight loss programs using techniques, procedures or materials similar or substantially similar to those techniques,

procedures or materials which are marketed or provided by Franchisor;

Freehold agreement, section VIII(A), Defendants' Exhibit 19.

22. The franchise agreements also included the following lease assignment clauses:

Upon the termination of this Agreement Franchisee shall assign to Franchisor, or its designee all of Franchisee's rights, title, and interest in and to Franchisee's telephone numbers, telephone directory listings and advertisements, leases and governmental licenses or permits used for the operation of the franchise.

Section XII. D, Freehold agreement.

Upon termination of this Agreement for any reason, Franchisee shall cease to be an authorized Franchisee and shall: ... assign to Franchisor, or its designee all of Franchisee's rights, title, and interest in and to Franchisee's telephone numbers, telephone directory listings, and advertisements, leases and governmental licenses or permits used for the operation of the Center.

Section XIV. I(7), East Brunswick agreement.

23. In all of their franchise agreements, plaintiffs agreed that injunctive relief would be appropriate in the event of breach. The covenants provide:

This Agreement is entered into between the parties hereto with the full knowledge of its nature and extent, Franchisee hereby, acknowledging that the qualifications for a Franchise by Franchisor are special, unique and extraordinary, and that this Agreement would not be entered into by Franchisor except upon one condition that such restrictive covenants be embodied herein and that, as such, they be enforceable, in the event of a breach by Franchisee, by injunctive relief.

Defendants' Exhibit 19.

24. On October 9, 1990, plaintiffs commenced this action, alleging breach of contract, violation of New Jersey law, and violation of 18 U.S.C. § 1962 (RICO). In their complaint, plaintiffs also seek injunctive relief declaring that the noncompete covenants in the franchise agreements are void and/or unenforceable. Defendants filed no responsive pleadings in this action. On November 2, 1990, they filed a motion to dismiss the claims under New Jersey law and the federal RICO claim. This motion is still pending before this court.

25. On the same date, October 9, 1990, plaintiffs filed their motion for preliminary injunction. On November 28, 1990, PWLC filed its cross-motion for preliminary injunction seeking to enforce the non-competition covenant.

## II. CONCLUSIONS OF LAW

The franchise agreements provide that Ohio law will govern issues involving interpretation of the agreements. Thus, the substantive law of Ohio will be applied in this case, as well as the applicable Sixth Circuit law regarding preliminary injunctions.

### 1. *Preliminary Injunction Factors*

■ Both parties have moved for a preliminary injunction regarding the covenants not to compete. Before a preliminary injunction can be issued, the following four factors must be considered:

1. Whether a movant has shown a strong or substantial likelihood or probability of success on the merits.
2. Whether the movant has shown irreparable injury.
3. Whether the preliminary injunction could harm third parties.
4. Whether the public interest would be served by issuing the preliminary injunction.

*Mason County Medical Association v. Knebel,* 563 F.2d 256, 261 (6th Cir.1977); *accord, Gaston Drugs, Inc. v. Metropolitan Life Insurance Co.,* 823 F.2d 984, 988 (6th Cir.1987); *Frisch's Restaurant, Inc. v. Shoney's Inc.,* 759 F.2d 1261, 1263 (6th Cir.1985); *Federal Savings and Loan Insurance Corp. v. Quinn,* 711 F.Supp. 366, 376 (N.D.Ohio 1989), *vacated on other grounds,* 922 F.2d 1251 (6th Cir.1991); *Hypoint Technology, Inc. v. Hewlett–Packard Company,* 684 F.Supp. 488, 489–90

(N.D.Ohio 1988), *vacated on other grounds,* 869 F.2d 1491 (6th Cir.1989). Further, "these factors are not to be rigidly required but rather, balanced according to their relative strengths." *Quinn,* 711 F.Supp. at 376. That is, "the four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met." *In re DeLorean Motor Co.,* 755 F.2d 1223, 1229 (6th Cir. (1985); *accord, Frisch's Restaurant,* 759 F.2d at 1263. However, even though the court must engage in this balancing test, "a plaintiff must *always* demonstrate some irreparable injury before a preliminary injunction may issue." *Friendship Materials, Inc. v. Michigan Brick, Inc.,* 679 F.2d 100, 104 (6th Cir. 1982); *see also Cripps v. Seneca County Board of Elections,* 629 F.Supp. 1335, 1340 (N.D.Ohio 1985). Finally, "district courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." *Wagner v. Taylor,* 836 F.2d 566, 575–76 (D.C.Cir.1987). With these standards in mind, this court must determine whether either plaintiffs or defendants have demonstrated a need for a preliminary injunction.

### A. Likelihood of Success on the Merits

Both motions pertain to the non-compete covenants. Thus, it must be determined whether either plaintiffs or defendants have demonstrated a substantial likelihood of success on the merits on the issue of the covenant's validity and enforceability.

■ This issue, first of all, depends upon whether PWLC seeks to protect a legitimate business interest and, if so, whether the covenant is reasonable. Ohio courts have held that both factors must be present for a covenant not to compete to be enforceable. *See Briggs v. Butler,* 140 Ohio St. 499, 45 N.E.2d 757 (1942); *E.P.I. of Cleveland, Inc. v. Basler,* 12 Ohio App.2d 16, 230 N.E.2d 552 (Cuyahoga Cty. 1967). Further, the courts have fashioned a three-pronged test to determine a non-compete covenant's reasonableness.

■ A covenant restraining an employee from

competing with his former employer upon termination of employment is reasonable if it is no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public. Courts are empowered to modify or amend employment agreements to achieve such results.

*Raimonde v. Van Vlerah,* 42 Ohio St.2d 21, 26, 325 N.E.2d 544 (1975). *See also Levine v. Beckman,* 48 Ohio App.3d 24, 27, 548 N.E.2d 267 (Franklin Cty.1988); *LCI Communications, Inc. v. Wilson,* 700 F.Supp. 1390, 1396–97 (W.D.Pa.1988) (interpreting Ohio law); *Keller v. Graphic Systems of Akron, Inc.,* 422 F.Supp. 1005, 1013 (N.D.Ohio 1976). Finally, even where the covenant is deemed unreasonable, it "will be enforced to the extent necessary to protect the employer's legitimate interests." *Raimonde, id.; see also Keller,* 422 F.Supp. at 1013.

■ The factors to be considered when modifying the covenant are the following:

Among the factors properly to be considered are: "[t]he absence or presence of limitations as to time and space, * * * whether the employee represents the sole contact with the customer; whether the employee is possessed with confidential information or trade secrets; whether the covenant seeks to eliminate competition which would be unfair to the employer or merely seeks to eliminate ordinary competition; whether the covenant seeks to stifle the inherent skill and experience of the employee; whether the benefit to the employer is disproportional to the detriment to the employee; whether the covenant operates as a bar to the employee's sole means of support; whether the employee's talent which the employer seeks to suppress was actually developed during the period of employment; and whether the forbidden employment is merely incidental to the main employment."

*Raimonde,* 42 Ohio St.2d at 25, 325 N.E.2d 544 (citations omitted). *See also Wolcott v.*

*Nationwide Mutual Insurance Co.,* 664 F.Supp. 1533, 1542 (S.D.Ohio 1987), *aff'd in part, rev'd in part* 884 F.2d 245 (6th Cir. 1989).

Defendants argue that the non-compete clauses serve several legitimate business interests. Specifically, they claim that PWLC created a business opportunity for plaintiffs which the latter used to their advantage, and that such a situation leaves PWLC's goodwill, trade name, reputation, prospective business opportunities, and confidential proprietary information open to harm. Plaintiffs, on the other hand, argue that PWLC's failure to exercise the lease assignment option to take over plaintiffs' closed centers shows they are in fact unconcerned about any claimed business interests and that defendants' motives in seeking enforcement of the covenants are thus punitive in nature. Plaintiffs also contend that, in any event, they are not presently using and do not intend to use, any confidential PWLC materials or information, that no trade secrets exist to protect, and that no single component of the PWLC system constitutes any diet system either somehow unique or different from other programs generally available to the public at large.

■ This court finds, first, that PWLC's failure to exercise the lease assignment option does not bar it from claiming a legitimate business interest. PWLC was not obligated by contract or otherwise to exercise this option; not being so obligated, it cannot be argued that PWLC no longer is permitted to claim its rights under the contract, such as under the covenant not to compete. Second, this court finds that PWLC does in fact claim a legitimate business interest. While it is true that very little evidence exists that plaintiffs are using any confidential information or trade secrets, it is also true that plaintiffs' existing business poses a danger to PWLC's prospective business.

This danger, first, is a potential harm to PWLC's goodwill. In such a situation, the franchisee has gained knowledge and experience from the franchisor, and to allow the franchisee to use this knowledge and experience to serve former or potential customers of the franchisor would work a hardship and prejudice to the latter. Economou has, in fact, testified that some former PWLC clients have switched to Health Options. Moreover, customer confusion is always a danger in this situation, especially where the former franchisee is operating his new business out of a center previously used to serve another principal. Such confusion has the potential of leading to damage to the franchisor's tradename and reputation.

There is a second, and clearly more important, business interest at stake here— survival of the business itself. The following testimony of Kocien elaborates on the need to protect his interest by means of the non-competition covenant:

Q. Would you please tell the Court why you are as the head of the franchising company, why you think it's important to enforce the covenant not to compete in this case with respect to the Freehold and East Brunswick retail center?
A. Well, I think it's important, not only there but in any other instance.
Q. Why is that?
A. And this is strictly my own personal viewpoint. I am not an attorney. I'm not a legal person. I am a book's person.

It's from a business standpoint, from a business standpoint, especially for most franchisors. Now, you can exclude franchisors that are huge and successful that are brand driven.

If you take MacDonald's, for example, that if you tell somebody you got to decharacterize your center, but you can do burgers somewhere else, it doesn't really make any difference for MacDonald's because it is brand driven, that franchise.

But in those franchises that are three, four, five $600,000 centers, the brand doesn't drive the system. The system drives the franchisor, and the only protection you have in franchising, the only governing clause, if you will, and in the franchise agreement is the noncompete.

It would be akin to patent protection for an inventor, akin to copyright profes-

sion for a playwright or guy that writes a book. If we don't get a non-compete that we can honor, we don't have a system.

If we don't win this case, we don't have a franchise. Because every time something goes wrong, some franchisee is going to say, "screw it." That's the way I see it.

Q. In the Freehold and East Brunswick retail center you heard the testimony that Mr. Economou was seeking to start up a business that would include anti-smoking clinic, stress relief, physical fitness in addition to weight loss.

Are you seeking to enforce the covenant not to compete with respect to anything other than the weight loss business at retail at those centers?

A. Only the weight loss business.

Q. What about Mr. Economou's desire to go to work for a company that sells programs to corporations that would be managed by doctors that include a weight loss component, are you seeking to bar him from doing that?

A. I hope he makes lots of money.

Q. So the only thing you are seeking to do has to do specifically with the retail center at Freehold and East Brunswick?

A. Yes.

Kocien testimony at 371–373. Kocien also testified that the PWLC diet system is "entirely original" and has "great value." Kocien testimony at 384, 385. Plaintiffs did not proffer any testimony to rebut that of Kocien. In sum, this court finds that PWLC claims to protect a legitimate business interest through enforcement of the covenants not to compete.

The next item facing the court is the issue of the covenant's reasonableness. Plaintiffs argue that the covenant is unreasonable as to duration and geographical scope and that the business sought to be enjoined is overly broad. Plaintiffs ask this court to declare the covenant void and unenforceable. Defendants contend that the evidence does not support plaintiffs' claims and that, in any event, Ohio courts allow judicial modification of such covenants which are unreasonable as long as a legitimate business interest is thereby served.

This court will examine this issue using the three-pronged *Raimonde* test enunciated above. The first element to be considered is whether the scope of the covenant is greater than is required for the protection of PWLC. In this regard, it is noted that in Ohio, courts have, in general, upheld the enforceability of similar covenants. In *Raimonde* itself, the Ohio Supreme Court upheld the trial courts' modification of a covenant establishing a 30–mile radius, three year limit to an 18 mile, three year limit. *See also Miller Medical Sales, Inc. v. Woustell,* 1990 WL 52526 (Ohio App. Franklin Cty.1990); *Roberts Express v. Bauman,* 1990 WL 48113 (Ohio App. Lucas Cty.1990); *Columbus Midway, Inc. v. Holtz,* 1988 WL 142304 (Ohio App. Licking Cty.1988) (all upholding a one-year covenant not to compete).

The aforementioned cases are in actuality of limited utility, however, because "each case must be decided on its own facts," using the guidelines in *Raimonde*. *Raimonde*, 42 Ohio St.2d at 25, 325 N.E.2d 544, quoting *Extine v. Williamson Midwest*, 176 Ohio St. 403, 200 N.E.2d 297 (1964). In this case, both covenants at issue contain a 50–mile geographical limit. The Freehold clause includes a durational limit of three years and the East Brunswick agreement's limit is one year. The Freehold covenant prohibits competition "which is the subject of this Agreement, including *but not limited to* diet control and weight loss programs using techniques, procedures or materials similar or substantially similar to those techniques, procedures or materials which are marketed or provided by Franchisor." (Emphasis added). The East Brunswick covenant prohibits "the operation of any business competitive with Franchisor. This shall include the operation of any type of business offering diet, weight control or exercise services or selling diet and weight control products."

This court notes, first, that the business sought to be enjoined by the covenants as they read is overly broad as applied to the

facts of this case. However, this is a non-issue, as PWLC has expressed that it is only seeking to enjoin the weight loss aspect of plaintiffs' current business. Thus, a modification of this aspect of the covenants is unnecessary with regard to the facts of this case.

Second, this court finds the 50–mile geographical limit to be reasonable. With regard to this issue, it is noted that the hearing presented no testimony one way or the as to the reasonableness of this limit.

Finally, this court finds the one-year limit in the East Brunswick agreement to be reasonable. This is a typical durational limit which has often been upheld in Ohio (see, *e.g.*, the cases cited above). However, this court can ascertain no reason for the three-year limit in Freehold. In this regard, again, the hearing elicited no relevant testimony. An application of the *Raimonde* factors is thus necessary. These factors indicate that a modification of the three-year limit to one year is reasonable under the circumstances. Specifically, plaintiffs do not represent the sole contact with the customer; the hearing presented no evidence that they are possessed with confidential information or trade secrets; the covenant does not seek to eliminate unfair competition, but rather only ordinary competition; and the benefit to PWLC from a three-year limit, as opposed to a one-year limit, may be outweighed by the detriment resulting to plaintiff from the three-year limit. The rest of the factors tend to favor PWLC; thus, the balancing comes out fairly equal. The deciding factor is the fact that, as mentioned, the court can find no reason for the arbitrary three-year limit in the Freehold clause.

The second *Raimonde* factor asks whether the covenant imposes an undue hardship upon the franchisee. The evidence at trial indicates that such is not the case. In this regard, it is noted that the weight loss program is only one facet of plaintiffs' current business and is the only part of that business sought to be enjoined. Further, Economou's testimony on this issue is conflicting. At one point, on direct examination, Economou was asked if the

weight loss program is just one facet of the program. Economou responded by answering, "Yes, it may not even be used. We have one company who will not even use it." Economou testimony at 160. Economou also stated that the weight loss element is a "small portion of the program." Economou testimony at 221. On the other hand, Economou also stated that "it appears [the Health Options centers at Freehold and East Brunswick] would not be able to go forward without a weight loss portion of the program." Economou testimony at 191. However, when asked if he had actually investigated this possibility, Economou was evasive and never actually answered the question. This court finds that, on the whole, an injunction prohibiting plaintiffs from conducting the weight loss portion of their business would not impose an undue hardship on them.

The third element, injury to the public, is hardly invoked in this case. If anything, the public interest is served by enforcing a covenant not to compete reasonable as to scope and duration.

Whether defendants are likely to succeed on the issue of the covenant's enforceability depends not only on the validity of the covenant itself, but also upon the validity of plaintiffs' breach of contract claims. In other words, if plaintiffs have demonstrated that defendants have materially breached the franchise agreements, such a breach would excuse them from further performance, *i.e.*, they would not be obligated to honor the noncompetition covenants. *See Sattler v. Sattler*, 30 Ohio App.3d 243, 246, 507 N.E.2d 430 (Lake Cty.1986) (citing *Wilson v. Wilson*, 30 Ohio St. 365, 373 (1876); *Yurchak v. Jack Boiman Construction Co.*, 3 Ohio App.3d 15, 16, 443 N.E.2d 526 (Hamilton Cty.1981). Thus, the testimony regarding the claimed breach of contract by defendants must be examined.

First of all, this court finds that it is unlikely that any material breach by PWLC occurred prior to the latter part of 1989. Economou testified that plaintiffs' relationship with PWLC was "very good" and that they enjoyed financial success for the first two years of operation. Economou testi-

mony at 136, 174–75. In addition, after two years of operation in two centers, plaintiffs created a financial proposal to a bank in New Jersey for a loan to help open up the Princeton franchise. Defendants Exhibit 11. In this proposal, plaintiffs painted a highly favorable picture of PWLC and the PWLC centers for the bank.

Q. Let's continue to take a look at that Page 4, where you describe the franchisor. Under statements, the franchisor supports all franchisees with the following:

1. Dynamic sales in marketing force. Was that true during the first two years of your operation?

A. We had, I would say, that up to the point that Anita became our service representative. No, that was not true.

Q. What about No. 27. The franchisor supports all franchisees with the following: A thorough franchise development team: center design, site location, planning and budgeting, effective advertising, assistance with lease negotiation. Was that true?

A. Not all those points, no.

Q. What about No. 37. Staff of experienced and professional service and sales representatives. Was that true?

A. We did have some service representatives come to us.

Q. What about comprehensive training and education development department? Did that take place during the first two years you were in business?

A. The monthly general training seminars dropped off. The sales reps was in and out.

Q. What about a national advertising coordinator, did the franchisor have such a person?

A. I don't recall when they did get one but eventually they did.

Q. What about planning and budgeting committee?

A. Not that I recall.

Q. Full service warehousing and distribution system?

A. Yes.

Q. National medical operations director?

A. Yes.

Q. How-to manuals for every phase of operations?

A. They were outdated.

Q. Toll-free hot line?

A. Yes, they did have one.

Q. Quality assurance specialist?

A. Yes.

Q. Now, if you will turn, please, to seventh page of the document, and you can use the document number at the bottom, that E number, 115, the page that starts, "Growth Plan."

A. Yes, I have it.

Q. Now, here on this page you are specifically talking about the growth in success that you experienced during the first two years of operations, are you not?

A. Yes, I am.

Q. You state here, "Since the initial franchise on East Brunswick we have shown success and profit as anticipated. The owners have maximized their earnings by opening the Freehold center. We are now expanding to Princeton with Brick Town, Long Branch, Toms River and other areas in the future." Was that a true statement?

A. That's what we were looking to expand.

Q. But was it a true statement that you had maximized your earnings?

A. Well, I don't know—we were opening to another center. We were using words in there.

Q. Were the words true? That is the question.

A. I would have to say they'd have to be.

Q. Or you wouldn't have used them in applying for a bank loan, correct?

A. Correct.

Q. Then you indicated if you look to the income projection, which is the last page there of the document. Would you turn to that, please? You actually put together for the bank based upon your experience at Freehold and East Brunswick, you put together a proforma income

statement to show what you anticipated you could make at Princeton, correct?

A. Yes.

Q. And you based it on revenue fees projected by having ninety patients per month?

A. That's correct.

Q. Was that the level of patient success you were having at East Brunswick and Freehold at that time?

A. East Brunswick would be in that area.

Q. What about Freehold, would be a little more?

A. Freehold was higher.

Q. Based on those projections that you did for the bank with that type of patient count you projected a net profit for the year of $156,500, didn't you?

A. Yes.

Q. And you took a whole list of operating expenses that you charged against your anticipated profits, correct, see those?

A. Yes.

Q. And were those operating expenses that you gave to the bank for this purpose ones that were based upon your actual experience at Freehold and East Brunswick?

A. I'm not sure how I came to these figures.

Q. Did you try to be truthful in purporting to show the bank what your expenses would be?

A. To the best of our ability.

Q. Based on historical experience?

A. I'm sure we did.

Q. In the end you said, "In summary we would like to state in the past two years we have proven this is a profitable industry. We are currently seeking a lending institution to help finance the Princeton center as well as the real estate purchase at 12 Roszel Park." Was that a true statement?

A. Yes.

Economou testimony at 179–183.

Further evidence that plaintiffs were satisfied with defendants' performance can be observed from plaintiffs' purchase of the Wayne franchise in March of 1989 and the circumstances surrounding this purchase. On March 3, 1989, Economou was interviewed by PWLC for the prospective Wayne franchise and filled out a questionnaire. Defendants Exhibit 15.

Q. Now, after you went forward with the purchase in Princeton, you opened up there in 1988, and then in 1989, you testified that you went into a fourth Physicians Weight Loss Center in Wayne; am I correct?

A. Yes.

Q. After you opened Princeton then you had an opportunity to see three Physicians Weight Loss Centers in operation before you moved to a fourth location in Wayne, New Jersey, correct?

A. Yes.

Q. In connection with getting the fourth franchise you were required to apply for that franchise and go through a review procedure at Physicians Weight Loss Center, right?

A. Yes.

Q. And you came out to Akron and you talked to the people out here and one of the things that you had to do was fill out a questionnaire before Physicians Weight Loss Centers would agree to granting you a fourth franchise, is that correct?

A. Yes.

Q. An, in fact, do you recall that this Exhibit No. 1 is a questionnaire that you filled out and signed in connection with applying for the fourth franchise?

A. Yes.

Q. And you also remember that in filling out this questionnaire, it was actually read to you by some representative of Physician Weight Loss, do you recall that?

A. Yes, I do.

Q. So that they went through all the questions and read them to you and you marked the answers, right?

A. Yes.

Q. If you will go to Question 21: "prior to purchasing your first franchise were any promises or guarantees made to you by anyone regarding the saleability or

profitability of the franchise centers described above?" And your answer was no; is that right?

A. Yes, it was.

Q. Was that a true answer?

A. I would imagine so.

Q. Turning to Question No. 28, recognizing now that you have been in operation as a Physician Weight Loss Center as of March 3, 1989, the date of this document, for approximately three years, question was posed to you, No. 28: "Is Physicians Weight Loss Center of America, Inc. currently, in default of its obligations under the terms and conditions of any franchise agreement pursuant to which you operated weight loss centers?"

And your answer was no. Was that a true answer that you gave on March 3, 1989 to that question?

A. At that time I wasn't really sure. We did want to take the center over because we were concerned about not having any negative publicity in the state so I did not make comments. I did mark off, no.

Q. Was it true?

A. I would imagine to a degree it was, but I'm sure there may be things I did not even bring up.

Economou testimony at 198–186. Also in 1989, plaintiffs wrote to PWLC and expressed interest in renewing the East Brunswick franchise. Defendants Exhibit 16. The East Brunswick franchise agreement was renewed and extended for an additional six months in September of 1989. Economou testimony at 186–187. In fact, on July 2, 1990, Economou wrote to PWLC and indicated that "we are having problems with the [East Brunswick] renewal, because our lease will expire in a few months.... *It is not that we are not interested in renewing*, it is just how do we go about making a commitment when we are unsure as to our site location." Defendants' Exhibit 18. Thus, plaintiffs were still expressing an interest in renewing the franchise in July of 1990, a full seven months *after* they noticed the "drastic" sales decrease in their business.

Based upon the foregoing testimony and evidence, this court can only conclude that it is unlikely that any material breach by PWLC occurred prior to at least the latter part of 1989.

This leaves the court with plaintiffs' three primary contentions in support of their breach of contract claim—the Dieters Information Sheet, PWLC's dietary change, and the alleged lack of franchisor support. With regard to the Dieters Information Sheet, this court finds that a causal connection between it and plaintiffs' decrease in sales is lacking. Further, the information sheet contained the same information that PWLC had been giving its franchisees for years. Kocien testimony at 362–64. Finally, the information sheet was created in response to an investigatory report which alleged that the VLCD diet may cause certain side effects. PWLC was merely attempting to make its clients more aware of these possibilities for their own protection as well as its own, and nothing in the franchise agreements precludes PWLC from accomplishing this by means of the information sheet.

This court further finds that PWLC's dietary change in September, 1989, also did not constitute a material breach of the contract. Economou's testimony support plaintiffs' claim that this change was a causal factor leading to their sales decrease in late 1989. However, Economou also testified that the East Brunswick center also lost money because "we did inherit a poor location when we purchased that site." Economou testimony at 220. In any event, the fact remains that the franchise agreements specifically allows PWLC to make such changes. Defendants Exhibits 20–22. These contractual clauses serve to defeat plaintiffs' breach of contract claim.

Evidence is also lacking as to the alleged lack of support given by PWLC when plaintiffs' business declined in late 1989. The only evidence in support of this claim is that Kocien did not respond to Economou's correspondence regarding his financial statements. However, Kocien did give plaintiffs $12,500 worth of products, Economou testimony at 195, and Economou testi-

fied that Anita Heisler, PWLC service representative, gave plaintiffs the best assistance she could by way of support services in 1989 and 1990. Economou testimony at 196. In light of this, the court finds it probable that PWLC did not breach its duty to support plaintiffs during this time.

One final argument regarding the alleged contract breach asserted by plaintiffs remains. According to them, the franchise agreements were contracts of adhesion and were not supported by valid consideration. No testimony was elicited at the hearing with regard to either argument. Further, the record as a whole demonstrates that plaintiffs enjoyed financial success and benefitted from their relationship with PWLC during most of the period they were franchisees. The testimony of Economou quoted above bears this out. Simply put, the agreements produced a mutually beneficial situation for all parties up until at least late 1989, and the argument at this point that the original agreements lacked consideration, without evidence in support of this claim, is without merit.

In sum, this court finds that defendants have shown a substantial likelihood of success on the merits as to both the validity of the covenants and plaintiffs' breach of contract claims. The Freehold and East Brunswick covenants must therefore be enforced, with the durational aspect of the Freehold clause modified to a one-year limit.[2]

### B. Irreparable Harm

 The showing required to meet the irreparable harm standard is, in reality, twofold: the injury must be both substantial and irreparable. With regard to the latter, the Supreme Court has stated that "the basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Sampson v. Murray*, 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974), quoting *Beacon The-*

*aters, Inc. v. Westover*, 359 U.S. 500, 506–507, 79 S.Ct. 948, 954, 3 L.Ed.2d 988 (1959).

> The key word in this consideration is *irreparable*. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at the later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

*Id.*, 415 U.S. at 90, 94 S.Ct. at 953, quoting *Virginia Petroleum Jobbers Association v. FPF*, 104 U.S.App.D.C. 106, 110, 259 F.2d 921, 925 (D.C.Cir.1958) (emphasis in original). In other words, a showing that money damages resulting from a successful trial will not adequately compensate the alleged harm is a showing that the harm is "irreparable." Of course, the movant must also show that the threatened injury is "substantial" to a "material degree." *Warner Amex Cable Communications, Inc. v. American Broadcasting Companies, Inc.*, 499 F.Supp. 537, 547 (S.D.Ohio 1980) (citation omitted).

As discussed above, plaintiffs and defendants both bear the burden of establishing irreparable injury, since both are moving parties. Whether a trial on the merits resulting in money damages will adequately remedy PWLC will first be ascertained. Whether a damages remedy will be adequate is often difficult to determine. It has been held that "a damages remedy can be inadequate for any of four reasons." *Roland Machinery Company v. Dresser Industries, Inc.*, 749 F.2d 380, 386 (7th Cir.1984). These four reasons are the following:

(a) The damage award may come too late to save plaintiff's business....

(b) The plaintiff may not be able to finance his lawsuit against the defendant without the revenues from is business that the defendant is threatening to destroy....

---

**2.** In their proposed findings, defendants also argue that the liquidated damages provision in the East Brunswick covenant constitutes a penalty. However, this damages provision is only an alternative to injunctive relief, and is not the

primary remedy sought. This court is granting injunctive relief *only;* thus, the validity of the liquidated damages clause is not properly in issue.

(c) Damages may be unobtainable from the defendant because he may become insolvent before a final judgment can be entered and collected....

(d) The nature of plaintiff's loss may make damages very difficult to calculate.

*Id.*

The first two reasons clearly are inapplicable to this case. As for the third, the evidence at trial indicates that plaintiffs suffered financial perils in late 1989; however, it is not clear that they will become insolvent in the near future. It is the fourth reason which is dispositive of this case. Most of PWLC's claims are not susceptible to calculation in terms of money damages. As discussed above, the purpose of the covenants is to protect against loss of control of reputation, loss of good will, and consumer confusion. In general, the courts have held these are sufficient grounds for a finding of irreparable injury. *See Opticians Association of America v. Independent Opticians of America,* 920 F.2d 187 (3d Cir.1990) and the cases cited therein: *Hasbro Inc. v. Lanard Toys, Ltd.,* 858 F.2d 70 (2d Cir.1988); *Home Box Office, Inc. v. Showtime/The Movie Channel, Inc.,* 832 F.2d 1311 (2d Cir.1987); *General Mills, Inc. v. Kellogg Co.,* 824 F.2d 622 (8th Cir.1987); *Rodeo Collection, Ltd. v. West Seventh,* 812 F.2d 1215 (9th Cir.1987). These cases all involved actions for trademark infringement, unlike this case, but the general principles for which they stand are applicable nonetheless. That PWLC has not sued for trademark infringement does not render the reasoning of these cases inapplicable. It is the nature of the harm alleged, not the nature of the cause of action, which is controlling for purposes of a motion for preliminary injunction.

On the other hand, plaintiffs have not demonstrated that a money damages remedy would not adequately compensate them. First, as discussed above, the overall operation of Health Options will not be enjoined, but rather only a portion of it. In other words, the evidence indicates that plaintiffs' current business will not be destroyed by enforcement of the covenants. Furthermore, with this in mind, plaintiffs have not shown that any harm to the business would not be quantifiable in terms of money damages.

The absence of irreparable harm to plaintiffs is further evidenced by plaintiffs' willingness to totally cease the Health Options business if PWLC exercises its option to assume the leases. Plaintiffs cannot on one hand argue that they are willing to give up their business completely if PWLC assumes the leases, while at the same time arguing that enforcement of the covenant will result in irreparable harm because it will force them to cease their business. Simply put, these mutually inconsistent positions serve to render plaintiffs' irreparable harm argument unmeritorious.

In sum, this court finds that defendants have demonstrated that irreparable harm will result to them if the covenants are not enforced, while plaintiffs have failed to so demonstrate.

### C. Injury to Other and the Public Interest

The remaining two factors under the preliminary injunction standard have little if any bearing on this case. There is no discernable injury to any third party which may result from the issuance of a preliminary injunction. Further, if the public has an interest in these issues at all, it is in seeing that reasonable non-compete covenants are preserved.

### III. CONCLUSION

For the foregoing reasons, the motion for preliminary injunction filed by defendants is hereby granted, with the Freehold covenant modified as indicated herein. The opinion hereby rendered is recognized as being lengthy. The court is of the view, however, that a close analysis of the questions presented might be beneficial to the parties and attorneys alike. The opinion is based upon those facts elicited during the hearing relating to injunctive relief only.

IT IS SO ORDERED.