**NATIONAL INTERSTATE INSURANCE COMPANY, Plaintiff,**

v.

**Eugene B. PERRO, Defendant.**

**No. 1:96–CV–981.**

United States District Court,
N.D. Ohio,
Eastern Division.

June 27, 1996.

Carl H. Gluek, Keith A. Ashmus, Thompson, Hine & Flory, Cleveland, OH, for Plaintiff.

Pete Elliott, Cleveland, OH, for Defendant.

## ORDER

O'MALLEY, District Judge.

On May 10, 1996, plaintiff National Interstate Insurance Company ("National") filed this case against defendant Eugene B. Perro. National claimed Perro, a former employee who had signed a Confidentiality and Non–Compete Agreement (the "Agreement") on January 4, 1995, breached the Agreement by reason of his new employment with Koshak, McLain & Associates, Inc. ("KMA").

In National's prayer for relief it sought to: (1) preliminarily and permanently enjoin Per-

ro from competing with National for one year from the date of the Court's Order; (2) preliminarily and permanently enjoin Perro from using or in any way disclosing National's confidential business information and trade secrets; (3) have Perro immediately return to National all documents and other records containing confidential information; (4) have Perro furnish a certified list identifying any confidential information taken from National and the disposition of such information; (5) obtain damages, attorneys' fees, and the costs of this action; (6) obtain prejudgment interest, if appropriate; and (7) obtain any other appropriate relief.

With its complaint, National also filed a motion for temporary restraining order, requesting that the Court enter an order requiring Perro to: (1) immediately cease working for KMA or engaging in any other business that competes with National in the sale of products or services related to public transportation insurance; (2) make no use or disclosure of any of National's confidential and proprietary information; (3) return to National all confidential and proprietary information in his possession or control; and (4) refrain from contacting, soliciting or doing business with any past or present customers of National that he serviced, or intended to service, within the twelve month period immediately preceding the date of termination of employment with National.

On May 13, 1996, the Court held a hearing on National's motion for temporary restraining order. Perro appeared at this hearing *pro se* by telephone. The Court granted in part and denied in part the motion for temporary restraining order, ordering, *inter alia*, as follows:

1. Perro shall immediately refrain from directly or indirectly selling public transportation insurance products or services to, or otherwise soliciting, any past or present customers or prospects of [National], if those customers or prospects do business in any of the following states: Minnesota, Wisconsin, Iowa, North Dakota, South Dakota, and Nebraska.

2. Perro shall immediately return to [National] all records, data, materials, and

information constituting or referring to [National's] confidential and proprietary information, if he has such materials in his possession or control. Such materials do *not* include information readily available in the public domain.

Order at 1–2 (May 16, 1996).

At the temporary restraining order hearing the Court ordered that the preliminary injunction hearing would be consolidated with a trial on the merits, as provided under Rule 65(a)(2). The trial to the Court on the merits was held on Friday, May 31, 1996, at which both parties appeared with counsel. On June 4, 1996, the Court issued its preliminary findings from the bench and requested that Perro's counsel prepare draft findings of fact and conclusions of law. In light of the Court's preliminary findings Perro agreed to be bound by the restrictions set out in the temporary restraining order pending entry of a final order. Pursuant to Rule 52(a), the Court now issues its findings of fact and conclusions of law which are in addition to those announced from the bench on June 4, 1996.

## I.

Based upon the testimony and exhibits admitted into evidence, the stipulations of the parties, and the credibility and demeanor of the witnesses, the Court finds the following facts in this case.

Perro resides at 9245 Woodhall Bay, Brooklyn Park, Minnesota. He resides there with his wife and son. At the time of trial, his wife was pregnant and expected to deliver on June 21, 1996. Perro's wife works as a part-time secretary, and Perro is the main source of income to his family.

Perro graduated from college in 1983 and assumed his first insurance-related job in 1984, with The Travelers in St. Louis Park, Minnesota. He worked for The Travelers as a claims representative, handling property casualty claims. In February of 1988, Perro switched his employment to Wausau Insurance in Edina, Minnesota, as an account representative selling commercial lines of insurance. In October of 1990, Perro began employment with Safeco Insurance in

Bloomington, Minnesota, serving as a marketing representative promoting Safeco's products through independent agents. Perro then began his employment with National on January 1, 1992.

While he was employed at National, Perro kept a "submission log" showing when and for which customers Perro submitted insurance applications to National. The submission log, together with uncontroverted testimony, shows that Perro only made submissions for prospects of National located in the six-state territory of Minnesota, Wisconsin, Iowa, North Dakota, South Dakota and Nebraska. Similarly, the prospect list used by Perro at National contains only prospects found in the same six-state territory. This prospect list is also known as a "4-line report."

Although some of the information contained in the prospect lists used by Perro at National is generally available to the public, some of it is not. The lists typically include the prospect's name, address, telephone number, contact name, and expiration date of the prospect's insurance policy. While some of this information is generally available from the Interstate Commerce Commission, the Department of Transportation, or the "Bus Directory," these sources are often incomplete, out-of-date, and not compiled in the fashion used by National. Thus, to at least some extent, the prospect lists used by Perro are confidential material. National has a legitimate interest in preventing employees from using customer-specific information developed through affiliation with and at the expense of National.

Until October of 1995, Perro was the principal sales contact for National in his six-state territory; independent agents and brokers in this territory were not permitted to sell or compete against Perro for National's products. In this role, Perro was able to develop relationships with detailed familiarity with the business needs of those National customers he serviced. During his employment with National, Perro had no access to National's central computer files outside of prospect information limited to his six-state territory. This limited access was assured by National through giving Perro a password to National's computer that permitted him access only to the prospect list in the six-state territory.

During Perro's initial days of employment, and periodically thereafter, he received training from National. Perro arrived at National with many skills necessary to sell National's products, but also needed additional instruction in order to understand National's pricing system, marketing strategies, sales techniques, and so on. For example, in September of 1993, Perro attended a meeting at National's offices at which Timothy Hathy, an underwriter for National, explained National's underwriting pricing sheet. This sheet reveals, to some extent, National's proprietary model for underwriting. Using this model, National is able to price its products competitively.

Hathy has an M.B.A. in Finance and is a Chartered Property Casualty Underwriter ("CPCU"). Hathy has years of experience and training in underwriting with National and other employers. Perro has no comparable education or training in underwriting, although he does have a college degree and 12 years of experience in the insurance industry.

Although Hathy generally reviewed the underwriting price work sheet and other related items with Perro and others in September of 1993, Perro credibly testified that he did not understand such matters and cannot generate or manipulate a similar pricing worksheet. Perro does not engage in underwriting work at KMA and would not be able to do so even if asked. Moreover, there is no evidence that Perro has disclosed any of National's underwriting or pricing information to KMA or any other entity, and there is no threat that he would, or could, do so. In sum, while Hathy (and probably several other National employees) is highly knowledgeable as to National's pricing model, Perro is not, so there is no danger that Perro will reveal National's pricing model to other entities.

Perro was hired at National at a base salary of $30,000. He received a company car, health benefits, 401K plan and life insurance. At the termination of his employment

at National, his annual base salary was $34,100 and his total monetary compensation for 1995 was $52,209.39.

At the commencement of his employment with National, Perro was not presented with any form of confidentiality or non-competition agreement. On or about January 4, 1995, however, Perro signed a Confidentiality and Non–Competition Agreement (the "Agreement"). Section 2 of the Agreement provides as follows:

2. *Confidential Information.* Both during and after Perro's employment with the Employer, Perro will maintain the confidentiality of confidential information of Employer and will refrain from using such information or disclosing it to anyone other than Employer or its employees. For purpose of this Agreement, confidential information is information which Employer endeavors to keep confidential including, without limitation, customer lists, employee lists, employee compensation, rate schedules, underwriting information, the terms of contracts and policies, project summaries, marketing plans, program designs, trade secrets, proprietary information (including software) and any such information provided by a third party to Employer in confidence. At the termination of Perro's employment or upon Employer's demand, Perro will provide to Employer all records containing confidential information of Employer as well as any copies made of that information, including handwritten notes made or derived from that information, or records which are the property of Employer.

The Agreement further states, in Section 3:

3. *Prohibited Solicitation/Non–Competition.* Perro shall not, through the terms of his employment, and for a period of twelve (12) months following termination of employment, engage in, directly or indirectly, whether as an individual on his own account or a corporation (on its own account) or as a shareholder, partner, joint venture, employee, agent, salesman, consultant, officer and/or director of any person, firm, corporation or other entity or otherwise, any or all of the following activities:

(a) enter into or engage in any business which competes, directly or indirectly, with the public transportation portion of the Employer's business, or any of its subsidiaries or affiliates; or

(b) call on, solicit or accept business from any entity on Perro's prospect, customer and/or quotation lists or any past or present account of Employer or any of its affiliates which Perro serviced within the twelve (12) month period immediately preceding the date of termination of employment for the purpose of providing any public transportation insurance or public transportation insurance-related product or service offered by Employer or any of its affiliates. "Account" means any policyholder, agent, group or association to which Employer or an affiliated company issued a quotation for insurance, issued an insurance policy, formed a purchasing group, a risk retention group, or provided any other insurance-related service.

Section 10 of the Agreement provides as follows:

10. *Employment–At–Will.* This Agreement in no manner alters the relationship which Perro has with the Employer. Perro acknowledges that he is an employee-at-will which means that either party may terminate the relationship at any time for any reason with or without cause.

Finally, Section 11 provides:

11. *Effective Date.* The effective date for all provisions of this Agreement except for paragraph 3 and its subparagraphs (a) and (b) will be its date of execution as noted below. The effective of the provisions of paragraph 3 and its subparagraphs (a) and (b) will be January 1, 1996.

Perro was paid $1,000 for signing the Agreement. As a further consideration for Perro to enter into the Agreement, National agreed that the non-competition portion of the Agreement would not become effective until January 1, 1996, approximately a year after its execution.

Prior to October of 1995, independent agents and brokers were excluded by National from selling National's products in Perro's territory. In October of 1995, however, National permitted independent agents and brokers to compete against Perro in his own territory for the first time. Even though such persons were now permitted to compete inside Perro's territory, Perro was not permitted to compete outside his six-state territory for the sale of National's products (except on one occasion in Montana, which the Court finds to be inconsequential). This change in employment conditions caused Perro to begin considering alternative employment. Following a job search lasting several months, Perro received a job offer with KMA. During the course of Perro's job search, he submitted approximately 240 applications for employment, conducted fourteen interviews for employment, and used three employment recruiters. The results of this search were that Perro received one offer of employment reasonably comparable to his employment with National; this offer came from KMA. Perro marketed himself to KMA based in part upon his public transportation insurance experience with National.

Perro received his job offer from KMA on April 10, 1996. On April 12, 1996, Perro submitted his letter of resignation to National, giving two weeks notice. On or about April 14, 1996 Perro returned the company vehicle and most of the company documentation to Alan Spachman, National's president. At this time, Spachman attempted to persuade Perro not to leave National's employ. When Perro persisted in his decision to go to KMA, a company which, though not a direct competitor to National, Spachman viewed as a competitor to some of National's subsidiary or affiliate brokers, Spachman immediately relieved Perro of his duties.

As a condition of Perro's employment with KMA, Perro and KMA agreed that for one year, Perro would not do any selling, prospecting, or any public transportation insurance work in the six-state territory he serviced at National. Further, Perro agreed with KMA he would not pursue any of National's current customers. Under the terms of Perro's employment with KMA, he receives a base salary of $25,000 per year (i.e. less than at National) and a 25% commission on new business. Under his agreement with KMA, Perro has no company car, 401K plan, health insurance, or life insurance, as he did with National.

At KMA, Perro is an employee at will. KMA indicated to Perro that, if a court enjoined him from working in the transportation insurance business, it would employ him as an insurance salesman in other areas for 90 days and then evaluate whether it would continue his employment. KMA further agreed to supply legal representation to Perro if National sued to enforce its Agreement.

As previously noted, upon granting in part and denying in part National's motion for temporary restraining order, this Court ordered Perro to return to National all records, data, materials, and information constituting or referring to National's confidential or proprietary information, if he had retained any. Perro had earlier claimed he had returned all such information, but to ensure compliance with this Order he undertook an additional search of his at-home office. Upon unexpectedly finding some submission logs and four-line reports, among other items, Perro promptly returned these to National. Perro's failure to return such items to National when he met with Spachman on April 14, 1996 was inadvertent, as the Court credits his testimony that he was unaware at that time that he had these items. Moreover, Perro did not use or disseminate any of the information contained in these items while employed at KMA.

## II.

The Court reaches the following conclusions of law. The standards for entering a permanent injunction are similar to those for granting a preliminary injunction:

1. The plaintiff has prevailed on the merits of its claims;

2. The plaintiff will suffer irreparable injury if the permanent injunction is not issued; and

3. The balance of the equities weighs in favor of the entry of the permanent injunction.

*Dayton Christian Schools v. Ohio Civil Rights Comm'n*, 578 F.Supp. 1004, 1017 (S.D.Ohio 1984), *rev'd on other grounds*, 766 F.2d 932 (6th Cir.), *rev'd and remanded on other grounds*, 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986).

■■■ To prevail on its claim for breach of the non-competition clause of the Agreement, National must show the existence of a contractual obligation not to compete and a failure to perform that contractual obligation. *See Basicomputer Corp. v. Scott*, 791 F.Supp. 1280, 1291 (N.D.Ohio 1991), *aff'd in part and vacated in part on other grounds*, 973 F.2d 507 (6th Cir.1992); *Premix, Inc. v. Zappitelli*, 561 F.Supp. 269, 276–77 (N.D.Ohio 1983); *Lion Secor Real Estate Co. v. Westgate Village Shopping Center*, 117 Ohio App. 96, 100, 191 N.E.2d 179 (Lucas Cty.1962). In Ohio, a non-competition covenant will be enforced "if the restraint is no greater than is required for the protection of the employer, does not impose undue burden on the employee, and is not injurious to the public." *Economou v. Physicians Weight Loss Centers*, 756 F.Supp. 1024, 1031 (N.D.Ohio 1991) (quoting *Raimonde v. Van Vlerah*, 42 Ohio St.2d 21, syll. ¶ 2, 325 N.E.2d 544 (1975)); *see also Rogers v. Runfola & Assocs., Inc.*, 57 Ohio St.3d 5, 565 N.E.2d 540 (1991); *Levine v. Beckman*, 48 Ohio App.3d 24, 27, 548 N.E.2d 267 (Franklin Cty.1988). When a covenant imposes an unreasonable restriction, the court should modify the agreement to the extent necessary to protect the employer's legitimate interest and then enforce the covenant as modified. *Economou*, 756 F.Supp. at 1031; *Raimonde*, 42 Ohio St.2d at syll. ¶ 1, 325 N.E.2d 544; *Levine*, 48 Ohio App.3d at 28, 548 N.E.2d 267.

■■ As the Sixth Circuit Court of Appeals has held:

> Under Ohio law, a court must examine a non-competition covenant to determine the reasonableness of the restrictions. *Raimonde v. Van Vlerah*, 42 Ohio St.2d 21, 325 N.E.2d 544, 547 (1975). To make that determination, the court should consider the absence or presence of a long list of factors: whether the covenant imposes temporal and spatial limitations, whether the employee had contact with customers, whether the employee possesses confidential information or trade secrets, whether the covenant bars only unfair competition, whether the covenant stifles the employee's inherent skill and experience, whether the benefit to the employer is disproportionate to the employee's detriment, whether the covenant destroys the employee's sole means of support, whether the employee's talent was developed during the employment, and whether the forbidden employment is merely incidental to the main employment. *Id.*

*Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir.1992).

## A. Success on the Merits

National does have a legitimate interest in protecting its confidential information. This information primarily includes its pricing information and underwriting model. In addition, National has a legitimate interest in preventing its employees from exploiting the customer relationships developed at its expense and in its name. Furthermore, the one-year duration contained in the Agreement is reasonable. In addition, Perro did not establish the defenses of lack of consideration or duress, to which he passingly referred.

■■■ Nonetheless, the Court finds that Perro has not breached Section 2 of the Agreement, relating to the confidentiality of National's confidential and proprietary information. There is no evidence that Perro has used or disclosed any of National's confidential information. For example, the four-line report and submission log used by Perro relates only to the six-state territory he serviced at National. A condition of Perro's employment at KMA, which Perro has kept, is that he will not sell within that territory. Thus, there has been no use of any confidential information by Perro, including the information he inadvertently retained until after this Court entered its temporary restraining order. Moreover, there is no evidence that such information was disseminated to KMA. For the same reasons, Perro is not in breach of Section 3(b) of the Agreement.

■ As to National's underwriting pricing sheet, because Perro is not knowledgeable about such information and cannot create or manipulate the same, there is no threat that he could breach the confidentiality of such information. Although employees within National's underwriting department probably understand such information, and other salespersons and management level employees may understand and be in a position to exploit this information, Perro did not and could not. Perro's working knowledge of the pricing sheet formulae is simply insufficient for him to harm National.[1]

■ Perro is in breach of Section 3(a) of the Agreement through being employed by a competitor of National's. However, the Court finds that the non-competition provision is greater than is required for the protection of National, and imposes an undue burden on Perro because it purports to restrict employment with a company in which Perro would work outside of his original exclusive six-state territory.

■ National receives adequate protection when Perro is restrained from selling in his previous territory. The customer contacts he developed, which are essential to the sale of National's products, were within that six-state territory, as was the customer and prospect information known to him at National. Thus, the Court finds that, *as currently restrained by the Court's previous Order,* Perro is not in breach of Section 3(a).

### B. Balancing the Equities

■ A balancing of the equities weighs in Perro's favor. While National has a protectable interest in its underwriting information and customer lists, there is no evidence that it will be harmed by Perro as to such information. Also, because Perro's duties at KMA are restricted to the areas outside his six-state territory at National, there is no convincing equitable interest that National has in preventing Perro from working as a salesman at KMA.

In contrast, restricting Perro from working for KMA in his present capacity will cause him harm. First, National seeks to restrain Perro from using certain valuable skills, some of which he gained prior to his joining National. Second, Perro will probably lose his job with KMA if the Court granted the full extent of injunctive relief sought. Third, the time and financial sacrifice it would take Perro to find a new job would be burdensome on Perro. Fourth, a more broad injunction in this case would be improperly punitive where there is no actual, threatened or potential disclosure of proprietary information to KMA by Perro. In sum, the balancing of equities weighs in favor of Perro, in light of the injunctive relief previously granted.

### C. Irreparable Harm

■ National established it would suffer irreparable harm if Perro is allowed to compete in his previous six-state territory. However, National will not suffer irreparable harm if the Court does not grant the full range of injunctive relief sought. Perro did not have access to information on National's computer other than customer information relating to his six-state territory. Also, much (but not all) of the information deemed by National to be confidential was either publicly available or was not sufficiently known by Perro to cause harm to National. Outside of the six-state territory, National has failed to meet its burden of proof on this issue.

### D. Public Interest

■ The Court believes that the public interest is always served in the enforcement of valid restrictive covenants contained in lawful contracts. To the extent the Agreement is lawful, therefore, the Court will enforce it. As presently constituted, however, the Agreement is unlawfully overbroad. Accordingly, the Court enforces the Agreement to the extent required to protect National's legitimate interests, but no further.

---

1. The Agreement is almost certainly enforceable *as written* against certain other National employees, who may have a different knowledge base and work experience. The Court's revision of the Agreement is based carefully on the facts of this case, which reveal the Agreement is overbroad as to Perro.

### E. *Conclusion*

The Court grants in part and denies in part the relief sought by National in its Complaint. The temporary restraining order is hereby ordered to be permanent and to be in full force and effect for a period of one year from after the date of its issuance (that is, through May 15, 1997). All other relief prayed for by National in its Complaint is hereby denied.

**IT IS SO ORDERED.**