523 A.2d 318

**Walter S. NOVAK, et al., Appellees,**

v.

**COMMONWEALTH of Pennsylvania, et al., Appellants.**

Supreme Court of Pennsylvania.

Argued Dec. 4, 1986.

Decided March 30, 1987.

Reargument Denied June 2, 1987.

John D. Raup, Chief Counsel, Frank A. Fisher, Jr., Acting Deputy Chief Counsel, Frank P. Clark, Asst. Counsel, Harrisburg, for appellants.

Stuart W. Davidson, Robert Sloan, Philadelphia, for appellees.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

FLAHERTY, Justice.

This is an appeal from a memorandum opinion and order of the Commonwealth Court which enjoined the Commonwealth and its agents and representatives from furloughing District Lottery Representatives of the Pennsylvania State Lottery, Department of Revenue (hereinafter department), until final administrative and court decisions take effect as to the District Lottery Representatives' grievance proceedings and Pennsylvania Labor Relations Board proceedings, or until earlier issuance of a further order by the Commonwealth Court. The factual background underlying the Commonwealth Court's action was as follows.

The department has employed, since the year 1972, a number of District Lottery Representatives (hereinafter DLRs). According to official job descriptions, each DLR

performs a variety of functions related to the marketing of state lottery tickets. These functions include coordination of advertising activities, distribution of lottery materials, evaluation of the performance of sales agents, and supervision of compliance with regulations and policies governing the sale of lottery tickets. The DLRs have been paid under a "portal-to-portal pay system" (hereinafter p-t-p). Under this system, the DLRs have treated their official headquarters for travel expense purposes as their homes, and they have received pay on an hourly scale from the time they leave their homes each workday until the time they return to their homes, on the basis of a 7½ hour work day, i.e., from 8:30 a.m. to 5:00 p.m., less a one hour unpaid lunch period.

In collective bargaining negotiations conducted between the department and the union representing the DLRs in 1981, the department sought to eliminate p-t-p. No agreement to do so was achieved, however, and in subsequent collective bargaining negotiations which ended in June, 1985, the department refrained from resubmitting the proposal to eliminate p-t-p. In those negotiations, the parties reached a new agreement to remain in effect until June, 1988.

In August of 1985, however, and on a number of other occasions extending into July of 1986, the department renewed proposals to eliminate p-t-p, but on each occasion union representatives rejected the proposals. Then, in July of 1986, the department proposed to reorganize the work of the DLRs by eliminating DLRs from field operations, replacing them with contractors to perform delivery and marketing functions and creating a smaller number of new positions in the Harrisburg area for employees who would use telephones to keep in contact with lottery ticket retailers. The department has regularly described elimination of p-t-p as desirable in the interest of promoting efficiency and productivity within the department, and the position of the department has been that, if p-t-p is not eliminated, most of

the present DLRs will be furloughed from their jobs through the reorganization plan.

The issue raised in the instant appeal is whether there was a proper basis for the issuance by Commonwealth Court of an injunction against the furlough of the employees in question. The standards governing issuance of preliminary injunctive relief are well established. In *Mazzie v. Commonwealth*, 495 Pa. 128, 133 n. 1, 432 A.2d 985, 987 n. 1 (1981), this Court set forth those standards as follows: "A preliminary injunction of any kind should be granted only where the rights of the plaintiff are clear, the need for relief is immediate and injunctive relief is necessary to avoid injury which is irreparable and cannot be compensated for by damages." (Citations omitted). The general scope of review applicable to cases where an appellate court is called upon to review the grant or denial of a preliminary injunction is also well settled. In reviewing the grant or denial of such an injunction, an appellate court is not to inquire into the merits of the underlying controversy, but rather must examine the record to determine whether there were any apparently reasonable grounds to support the action of the court below, and, if it is plain that no grounds exist to support the decree or that the rule of law relied upon was palpably erroneous or misapplied, the decision of the court below must be reversed. *Roberts v. Board of Directors of School District of Scranton*, 462 Pa. 464, 469, 341 A.2d 475, 478 (1975). See also *Mazzie v. Commonwealth*, 495 Pa. at 133, 432 A.2d at 988. We have examined the record in the present case and find a lack of reasonable grounds to support the injunction issued below.

■ It is established in this Commonwealth that employment with the government is not a matter to which one has a per se right, and, if an employee is entitled to employment, the source of the entitlement must normally be legislative or contractual in nature. *Commonwealth, Office of Administration v. Orage*, 511 Pa. 528, 531, 515 A.2d 852, 853 (1986). In addition, it is recognized that governmental agencies have a strong interest in preserving their manage-

ment prerogatives to streamline the functions of their departments for the sake of promoting efficiency. In the context of a case involving the furlough of governmental employees, this Court stated as follows in *Commonwealth, Department of State v. Stecher,* 506 Pa. 203, 210–212, 484 A.2d 755, 758–759 (1984):

> Decisions as to what tasks should be performed, and by whom, are particularly within the realm of an agency's management officials. If an agency seeks to accomplish its mission in a more efficient manner, by redistributing work among its employees, it is pursuing a commendable administrative objective. It can be said that, almost as a general rule, governmental institutions claim to be understaffed, and rare indeed is the agency that admits to having an excess of employees. Governmental agencies so easily become myopic as to their purposes, losing sight of the goal of adequately serving the public at the lowest possible cost to the taxpayers.
>
> . . . .
>
> It is a managerial prerogative to reallocate work to enhance operational efficiency and to effect cost savings. To limit management's power in this area would be to draft a blueprint for an ever-expanding bureaucracy, which naturally will tend to fuel institutional growth and taint the very purpose of our government. Government exists to serve the people, and should be manned by the fewest number of employees who can accomplish the task of serving the citizenry in the most efficient and least costly manner possible.

Thus, consideration of whether there exists a reasonable basis for the preliminary injunction issued in this case must be undertaken with due regard for the fact that there is no per se right to governmental employment, as well as for the fact that there is a strong public interest in preserving management's prerogative to achieve efficiency in governmental operations. Based upon these considerations, the department argues that issuance of the instant injunction

constituted an unwarranted interference with management of the Pennsylvania State Lottery. We agree.

The harms which the Commonwealth Court sought to prevent by issuance of the injunction, namely the consequences that could conceivably be incurred by employees as a result of being furloughed, are speculative in nature, whereas the injunction's interference with management of the department is of a most certain form. In holding that irreparable harm would be suffered by the employees if an injunction against the furloughs were not to be issued, the Commonwealth Court reasoned that, during the period required for final resolution of unfair labor practice proceedings and grievance proceedings that had been instituted with respect to the furlough actions, furloughed DLRs might face hardships and losses deriving from the possible need to relocate to obtain new employment, possible mortgage foreclosures, disruption of spousal employment, disruption of children's schooling and social patterns, and interruption of medical care provisions. It is established, however, that "speculative considerations ... cannot form the basis for issuing [a preliminary injunction]." *Berkowitz v. Wilbar*, 416 Pa. 369, 374, 206 A.2d 280, 282 (1965) (preliminary injunction against dismissal from employment denied). Further, losses arising from termination of employment have not been regarded as providing a basis for a finding of irreparable harm. As stated in *Berkowitz*, 416 Pa. at 374, 206 A.2d at 282, where an employee sought a preliminary injunction to avert alleged harms that might ensue from a termination of employment, "These are not matters of record before us, and even if a hearing had been held to prove these specific items of hardship, at best they are speculative considerations which cannot form the basis for issuing the extraordinary relief sought."

Indeed, the speculative harms cited by Commonwealth Court are nothing other than new versions of the same events that could have occurred with respect to any other employees who have ever been furloughed, dismissed, or otherwise separated from employment. The position of

the DLRs is not, therefore, unique, and there appears no basis for departure from settled remedies which have traditionally been made available to employees who believe the terms of their employment contracts have been infringed. Injunctive relief is not normally available in cases involving employment contract disputes such as the one in the instant case, since damage awards are deemed adequate to compensate for losses that result from breaches of such contracts. *Clark v. Pennsylvania State Police,* 496 Pa. 310, 436 A.2d 1383 (1981) (injunctive relief denied and damages deemed an adequate remedy for breach of employment contract terms governing promotions). See also *Berkowitz v. Wilbar,* supra (injunctive relief not available to avert an improper dismissal from employment); *Ezy Parks v. Larson,* 499 Pa. 615, 628, 454 A.2d 928, 935 (1982) (damages normally an adequate remedy for breach of contract).

In issuing the instant injunction, Commonwealth Court noted that the threat of immediate furloughs might have coercive effects upon the exercise of the rights of the DLRs during the proceedings instituted before the Pennsylvania Labor Relations Board to determine whether the furloughs constituted an unfair labor practice, and in grievance proceedings that had been set in motion to challenge the proposed furloughs. We believe that consideration of such speculative factors was, however, improper. Conflicts between unions and employers inherently involve coercive influences, from both sides of the bargaining table, and there is no basis for the conclusion that irreparable harm is incurred merely as a result of the fact that department management has at its behest certain bargaining tools with which to possibly counter the instant union's position regarding proposals to alter the p-t-p pay system. The effects, if any, which the proposed furloughs might have upon the outcome of grievance proceedings and Pennsylvania Labor Relations Board proceedings are of a most speculative nature, and, thus, do not supply a proper basis upon which to award injunctive relief. See *Berkowitz v. Wilbar,* supra.

Further, by issuing an injunction against furlough of the DLRs, Commonwealth Court has, in effect, intruded upon the collective bargaining process to modify what Commonwealth Court deemed, for whatever reason, to be inadequate protections afforded under the collective bargaining agreement for furloughed employees. The injunction effectively imposes upon the department significant new impediments to the achievement of efficiency in the department, hampering and substantially delaying efforts to remove unnecessary employees from the payroll, thereby working to the detriment of the public interest in governmental efficiency.

If, in its attempt to streamline operations of the Pennsylvania State Lottery, the department initiates furloughs that are later determined to have been improper, under the collective bargaining agreement and under applicable labor laws, appropriate remedies can then be afforded. Damage awards are adequate to rectify losses suffered by improperly furloughed employees, and there are available to such employees the usual administrative remedies such as reinstatement, restoration of seniority, restoration of back pay and fringe benefits, etc. In conclusion, therefore, we find no reasonable basis for the Commonwealth Court's determination that the DLRs have no adequate remedy at law and that irreparable harm would be suffered if a preliminary injunction were not issued to prevent the instant furloughs. Accordingly, the injunction in question must be vacated.

Order vacated.

NIX, C.J., and LARSEN and ZAPPALA, JJ., filed dissenting opinions.

NIX, Chief Justice, dissenting.

Judge Craig, in a Memorandum Opinion, ably sets forth the reasons for the grant of the preliminary injunction (See Exhibit "A"). I find the arguments to the contrary, offered by the majority opinion, unpersuasive. I, therefore, dissent.

198

August 21, 1986

MEMORANDUM OPINION BY JUDGE CRAIG

Pursuant to evidentiary hearing held on petitioners' motion for preliminary injunction, the chancellor finds as follows:

1. Petitioners consist of the American Federation of State, County and Municipal Employees, Council 13, AFL-CIO, by its trustee ad litem (union), and nine individuals, each of whom is employed as a District Lottery Representative (DLR) of the Pennsylvania State Lottery, Pennsylvania Department of Revenue.

2. The respondents consist of the Commonwealth itself, the Governor, his Secretary of Administration, the Secretary of Revenue and pertinent officials of the Department of Revenue.

3. According to official job description, each DLR performs a variety of duties in implementing the marketing program for the promotion and sale of lottery tickets. DLRs coordinate advertising, distribution and control of lottery materials, evaluate license applications, evaluate performance of sales agents, make recommendations on the same and insure compliance with departmental regulations and policies. DLRs also make delivery of tickets and pick up returns from banks. DLRs participate in marketing studies and prepare reports. They answer questions and supply information to sales agents. They conduct delinquency investigations of retailers and informally audit or review the records of retailers or agents.

4. The Secretary of Revenue's letter advising DLRs of their appointment states, among other matters, that:

Your official headquarters for travel expense purposes will be your home.

5. As an established past practice for fourteen years since 1972, the Department of Revenue has paid and continues to pay DLRs under a "portal-to-portal pay system" (p-t-p), under which they are on hourly pay from the time

they leave their homes each workday until the time they return to their homes, on the basis of a 7½–hour day, i.e., from 8:30 a.m. to 5:00 p.m., less a one-hour unpaid lunch period.

6. In the 1981 collective bargaining negotiations with the union, the department proposed to eliminate p-t-p; no agreement was achieved to do so.

7. The department did not resubmit the proposal in the collective bargaining negotiations ending in June, 1985, pursuant to which the parties developed a new agreement remaining effective until June 30, 1988.

8. In connection with the same union, analogous p-t-p pay system issues have been affirmed by arbitration awards, with respect to certain weights and measures employees in 1977 and parole board employees in 1981, issued pursuant to grievances filed following state efforts to eliminate the system. Pet.Exh.R, S.

9. Beginning in August of 1985, at a labor management meeting between union representatives and lottery representatives, the secretary of the department and other management representatives have proposed to eliminate the p-t-p pay system for DLRs. Department management representatives have renewed the elimination proposal on a number of occasions from August 1985 into July of 1986, and union representatives have each time rejected the elimination proposal.

10. Initially, by discussions and then, in July of 1986, by memoranda from the department's director of personnel, the department has proposed to reorganize the work of the DLRs by eliminating DLRs in field operations as at present, replacing their delivery and marketing display functions by contractors and creating a smaller number of new positions in the Harrisburg area to deal with retailers primarily by telephone. The department proposal involves furloughing the home-based DLRs working in the respective six areas of the state, proceeding one area at a time, beginning with the thirteen DLRs now remaining in the Pittsburgh area.

11.  Departmental oral and written communications have regularly described the elimination of the p-t-p pay system as desirable for the achievement of productivity goals. However, department management has in fact not presented the proposed reorganization as a definite administrative action desirable for its own sake, but has consistently presented it only as an alternative which the department would undertake if the union declines to accept elimination of the p-t-p pay plan.  Accordingly, the department's position, as communicated to the union representatives and DLRs in the six areas of the state, has essentially been that, if the p-t-p pay plan of DLRs is not eliminated, the present DLRs will be furloughed from their jobs.

12.  In fact, by written notification of July 25, 1986, the department's director of personnel informed the union and the respective Pittsburgh DLRs that all DLR positions in the Pittsburgh area will be eliminated and all DLRs will be furloughed effective August 28, 1986.

13.  Department management officials, after the announcement of the Pittsburgh furloughs, have continued to communicate the prospect of such furloughs being invoked in other areas if the p-t-p pay system is not eliminated.

14.  No evidence appears in the record to explain why, if the "telemarketing" mode of operation proposed in the reorganization is desirable as an administrative end in itself, it must be immediately initiated from Harrisburg rather than being conducted out of the department's Pittsburgh office as an alternative to the home-based operation of the DLRs.  That is, no valid reason appears to explain the initial transfer of all DLR functions (except those given to outside contractors) from Pittsburgh to Harrisburg, rather than having them conducted—albeit by a smaller number of employees—from the Pittsburgh office.  Although the department could avoid furloughing 100% of the Pittsburgh DLRs and still revise the mode of operation, the department has not done so.  The evidence indicates that the reorganization proposal is primarily a means of coercion rather than a genuine plan for administrative improvement.

15. The thirteen furloughed Pittsburgh DLRs are qualified to fill the proposed new DLR positions in Harrisburg. Because only seven new positions are presently proposed, selection of DLRs willing to move to Harrisburg would be achieved in accordance with seniority provisions of the collective bargaining agreement.

16. Furloughed DLRs and the union have instituted, with respect to the furlough actions, (1) unfair labor practice proceedings before the Pennsylvania Labor Relations Board (PLRB) on the ground that the department is using the furloughs unlawfully to coerce the employees with respect to their bargaining rights and (2) grievances on the ground that the furloughs are being employed to coerce the employees into giving up a pay system based upon established past practice.

17. During the period required for the final resolution of the unfair labor practice and grievance proceedings, which may be as short as several months or as long as two years or more, furloughed DLRs face hardship and losses which would not be remedied by dispositions of those proceedings in their favor. Pittsburgh DLRs who elect and obtain placement in the new Harrisburg positions would face the necessity of relocating their homes twice, if the proceedings determine the alleged reorganization to be invalid as a coercive device, by reason of leaving or selling their homes and disrupting family roots to move to central Pennsylvania, and then doing the same in order to return to western Pennsylvania. Such dislocations include, in addition to the sale and purchase or lease of two residences, disruption of spouse employment, disruption of children's schooling and social patterns, and disruption of medical care arrangements. Even if arbitrators or the PLRB awarded backpay—which is not assured even in the event of decisions in favor of the employees—compensation for relocation expenses and family losses is not available. With respect to DLRs not eligible to be placed in the new Harrisburg positions, their loss of employment could later be compensated if backpay awards are made, but consequent losses—

such as those ensuing from mortgage foreclosures—would involve noncompensable economic, personal and social hardships.

18. Although the evidence indicates that DLRs who obtain placement in the new central Pennsylvania positions conceivably face greater irreparable harm during the determination proceedings than those who decline placement, remain in western Pennsylvania and are fortunate enough to find other employment temporarily, the furloughed DLRs cannot be reasonably expected to forego the placement opportunities in the face of their need for gainful employment. The department's insistence on establishing the new positions remotely has an effect similar to a forced transfer as to those DLRs—up to seven in number—who could obtain the new positions.

19. If relief is not afforded in the form of enjoining the furloughs pending determination of the labor proceedings, no future remedy is available to offset the coercive effect of the department's threat of reorganization, as an alternative to foregoing the p-t-p system, upon the past-practice labor rights of the remaining five groups of DLRs elsewhere in the state.

20. Refusal of a preliminary injunction will subject the furloughed DLRs to greater injury than would result to the interests of the Commonwealth by reason of postponing the change in method and location of operation of the DLR functions. First, the revised mode of operation does not appear to be desired by the department on its own merits solely, but rather as an alternative to the p-t-p pay system which the department opposes. Second, the fact that, according to the secretary, the department has already deferred the matter for fifteen months indicates that the department sees no great urgency in effectuating a change. Third, the department—which views the initial Pittsburgh change as a pilot test of its approach—could test the approach by instituting some of the new methods from the Pittsburgh office without insisting upon a wholesale transfer of functions to central Pennsylvania.

### Discussion

The factual elements required as a basis for the issuance of a preliminary injunction in a case like this are well established. *Mazzie v. Commonwealth,* 495 Pa. 128, 432 A.2d 985 (1981). This opinion deals with them in the foregoing Findings Nos. 17–20, and in the following conclusions of law.

Although this court should avoid indicating a conclusive disposition on the merits—recognizing that such is initially within the jurisdiction of the PLRB and the arbitrator—the petitioners, from the evidence, appear to have a clear legal right to a favorable decision on the merits in the grievance and PLRB proceedings because the record strongly indicates that the reorganization plan is not a genuine one.

The pivotal question here is the irreparability of the harm. Although the situation here is not as clearcut as that in *Mazzie,* the evidence here strongly indicates that the departmental "reorganization"—particularly as it involves a transfer of functions unnecessarily, at this time, to central Pennsylvania—constitutes a device designed to coerce agreement as to the elimination of the p-t-p pay plan. Therefore, in addition to those elements of the individual employees' losses which are not compensable, it appears that allowing the department to invoke job furloughs, as a coercive device, would constitute the allowance of imposition of irreparable harm upon the union as a party by subjecting the collective bargaining process to an unjustified constraint.

### Conclusions of Law

A. This court has jurisdiction.

B. The petitioners have a clear legal right to ultimate relief, and the likelihood is great that they will prevail on the merits.

C. The petitioners, in the absence of a preliminary injunction to preserve the status quo, face irreparable harm as individuals and as a union.

D. Greater injury would be suffered by the petitioners if preliminary injunction relief is withheld than would be suffered by the Commonwealth if it is granted.

E. The petitioners are entitled to preliminary relief, essentially as requested.

LARSEN, Justice, dissenting.

I dissent.

The majority correctly cites *Mazzie v. Commonwealth*, 495 Pa. 128, 432 A.2d 985 (1981), for the standard of review in this case, which standard requires that this Court determine, upon examination of the record, whether "there were *any apparently reasonable grounds* to support [the] action [of the lower court] and [to] reverse only if *no* such grounds exist." *Id.*, 495 Pa. at 134, 432 A.2d at 988 (emphasis added). Then the majority proceeds to misapply the standard and vacates the order of Commonwealth Court by finding "a *lack* of reasonable grounds to support the injunction." Maj. op. at 193. Questions of semantics aside, what the majority has done is to lose sight of the evidence supporting Commonwealth Court's finding that the District Lottery Representatives (DLRs), appellees, were likely to prevail on the merits in the grievance and PLRB proceedings. Furthermore, the majority balances "impediments to the achievement of efficiency in the department" with the specter of economic, personal and social losses which would befall furloughed employees pending resolution of the grievance proceedings and the coercive effect of the furloughs on the collective bargaining rights of the remaining DLRs.

This balancing of interests and harms is *not* what is contemplated by the standard of review we have adopted in appeals from the imposition of a prohibitory preliminary injunction, and indeed, this balancing reaches the ultimate merits of the underlying controversy.

To issue a preliminary injunction, Commonwealth Court was required to find that (1) the rights of the plaintiff are clear; (2) the need for relief is immediate; and (3) injunctive

relief is necessary to avoid injury which is irreparable and cannot be compensated for by damages. *Mazzie v. Commonwealth, supra,* 495 Pa. at 133 n. 1, 432 A.2d at 987 n. 1.

The majority inappropriately determines that appellees do not have a "per se right" to employment with the government. The "right" that must have been clear to the Commonwealth Court in this case was appellees' likelihood of success on the merits of the matter before the PLRB and *not* the right of employment with the government. If appellees succeed before the PLRB, then the initiation of the furloughs would have constituted an unfair labor practice; thus the department would have had no right to impose the furloughs as a bargaining tactic.

There were "apparently reasonable grounds" to support Commonwealth Court's action in this case. First, analogous portal-to-portal (p-t-p) pay systems have twice been upheld by arbitrators during grievance proceedings instituted by other members of the same union following state efforts to eliminate the systems. Second, the department did not resubmit the proposal to eliminate the p-t-p pay system in collective bargaining negotiations ending in June 1985, choosing instead in July 1985, to seek the system's elimination by proposing a reorganization involving loss of jobs and dislocations as the only alternative should the union not capitulate on the pay system issue. It took no stretch of the imagination for Commonwealth Court to conclude that the proposed reorganization plan was not genuine and that the union would most likely succeed before the PLRB.

The need for relief was certainly immediate in that the furloughs were scheduled to take effect on August 28, 1986.

On the issue of irreparable, non-compensable harm the Commonwealth Court held that the evidence was clear that of the thirteen DLRs scheduled for furlough, seven would have the "opportunity" to relocate to Harrisburg and six would be standing in line seeking unemployment compensation. Following final resolution of the grievance proceed-

ing, perhaps as long as two years or more after the furlough took effect, an appellee success would mean reinstatement and back pay, but *no compensation* for the very real consequences of dislocation and layoff, i.e., the losses attendant upon the sale and purchase or lease of two residences, disruption of spouse employment, disruption of children's schooling and social patterns, disruption of medical care arrangements and mortgage foreclosures.

The majority concluded that there was no harm to appellees and in support thereof states that these losses are "speculative", that they "might" occur, that they are "possible", and cites a 1965 case in which there had not been any hearings to establish such losses and hardship on the record. *Berkowitz v. Wilbar*, 416 Pa. 369, 206 A.2d 280 (1965). In the case sub judice, such testimony *was* elicited and provided a reasonable ground for Commonwealth Court's conclusion of irreparable harm and thus injunctive relief was necessary to preserve the status quo pending resolution of the grievance proceedings.

The majority further errs in dismissing Commonwealth Court's conclusion that no remedy would be available "to offset the coercive effect of the department's threat of reorganization, as an alternative to foregoing the p-t-p system, upon the past-practice labor rights of the remaining five groups of DLRs elsewhere in the state." Mem. op. at 202. The majority views this coercive effect as merely "speculative" and states that: "there is no basis for the conclusion that irreparable harm is incurred merely as a result of the fact that department management has at its behest *certain bargaining tools* with which to possibly counter the instant union's position regarding proposals to alter the p-t-p pay system." *Id.* (emphasis added).

The majority insists that the reorganization plan is a legitimate action taken by a department concerned with efficient governmental operation and that the courts must not impede this pursuit of efficiency. Yet, the majority concedes that the plan is a coercive bargaining tool, which

Commonwealth Court has determined will likely be deemed an unfair labor practice by the PLRB.

Therefore, I dissent, and would affirm Commonwealth Court's issuance of a preliminary injunction.

ZAPPALA, Justice, dissenting.

Despite the majority's articulation of the proper scope of review of the grant or denial of a preliminary injunction, it has failed to limit its inquiry as required to whether the lower court's action was supported by reasonable grounds. In determining that the Commonwealth Court's issuance of the injunction was unsupportable, the majority has disregarded the specific findings of fact made by the lower court.

The court found that the department management representatives have been unsuccessful to-date in their attempts to eliminate the portal-to-portal pay system during collective bargaining negotiations with the union. The department did not resubmit the elimination proposal during the collective bargaining negotiations ending in June, 1985, resulting in an agreement which remains effective until June 30, 1988. Having been rebuffed in prior negotiations and having failed to resolve the portal-to-portal issue in 1985, the department has resorted to coercive tactics to achieve its desired result. The department's position, which had been communicated to the union representatives and district lottery representatives, was that elimination of the existing pay system must be forthcoming or that furloughs would result.

Having abandoned its efforts to suspend the pay system during the most recent negotiations, the department cannot now extort such a concession by threat of furloughs. Although no per se right to governmental employment may exist in itself, contractual rights under the collective bargaining agreement entered into by the parties in this case do exist. The majority's analysis disregards the existence

of the agreement. It would emasculate the collective bargaining process to permit the department to accomplish the pay system's demise under the guise of efficient operation of services. While achieving efficiency in governmental operations is a laudatory managerial prerogative, subverting the collective bargaining process is not. I would note also that the department would not be precluded from employing the possibility of furloughs as a tactic during future negotiations for a new agreement after the existing one expires in 1988. What the department failed to do directly in 1985, however, cannot be done surreptitiously today in contravention of the agreement.

The majority also overlooks the specific findings of fact which were made in concluding that the harms which the Commonwealth Court sought to prevent by issuance of the injunction are speculative in nature. The court found that the thirteen furloughed district lottery representatives from Pittsburgh would be qualified to fill the seven proposed positions in Harrisburg and that the seniority provisions of the collective agreement would control the placement of the displaced representatives in the new positions. The relocation of Pittsburgh representatives to the eastern part of the state and the reduction in the number of positions are not illusory economic consequences, as the majority would have one believe. These economic consequences are matters of record as distinguished from the case of *Berkowitz v. Wilbar*, 416 Pa. 369, 206 A.2d 280 (1965) which is cited by the majority. The majority ignores its limited standard of review by quarreling with the Commonwealth Court's conclusion from facts undeniably supported by the record. The issue before this Court is not whether we might arrive at a different conclusion than the lower court upon hearing the evidence, rather, whether the lower court's action was properly supported. I believe that the grant of the injunction was reasonably based upon the grounds set forth in the findings of fact of the Commonwealth Court. For these reasons, I dissent.