NOVUS FRANCHISING, INC., Plaintiff,

v.

Cynthia Rowe TAYLOR, t/a C. Rowe's Windshield Repair, Defendant.

Civ. A. No. 1:CV–92–0010.

United States District Court, M.D. Pennsylvania.

Feb. 14, 1992.

John P. Krill, Jr., Andrew H. Cline, Kirkpatrick & Lockhart, Harrisburg, Pa., for plaintiff.

Michael A. Finio, Goldberg, Katzman & Shipman, Harrisburg, Pa., for defendant.

## MEMORANDUM

RAMBO, District Judge.

Before the court is plaintiff's motion for a preliminary injunction seeking to enjoin defendant, a former franchisee of plaintiff, from 1) use of plaintiff's service marks and 2) from engaging in a competitive business with plaintiff per a restrictive covenant in the franchise agreements. The court held a hearing on this motion on January 30, 1992 at which both parties presented their respective cases. At the hearing, defendant agreed to cease use of any of plaintiff's marks or equipment, and accordingly those issues, as they relate to the injunction, are now moot. The main issue now before the court—whether a preliminary injunction is appropriate to enforce the restrictive covenant—is fully briefed and ripe for disposition.

*Background*

Plaintiff Novus Franchising, Inc. is the patent holder of a process by which a technician may repair small craters and cracks in windshields, as opposed to replacing the entire piece of glass. Repairs are performed by injecting a resin into the damaged area through a special tool. The resin is then hardened with ultraviolet light to create a clear match with the surrounding glass.

Defendant Cynthia Rowe Taylor launched her foray into the windshield repair field in 1980, when she became a licensee in Novus' "Methodman II" network. Mrs. Taylor received training in repair technique through Novus, signed licensing agreements, and purchased the Novus equipment necessary to undertake the repair of windshields. At the hearing, Mrs. Taylor testified that the base of operations of her new enterprise, which she named C. Rowe's (her former last name) Windshield Repair, was her home. However, she spent much of her time on the road repairing windshields and making sales calls on insurance agents, truck fleets, and other businesses which could benefit from windshield repair versus windshield replacement.[1] Mrs. Taylor testified that the concept of windshield repair was relatively new in the early 1980s, and Mrs. Taylor stated that much of her time in the early years was spent convincing potential clients that repair of cracks and dings was a viable alternative to wholesale replacement. (Cynthia Rowe Taylor Testimony, Tr. at 127–28.) At some point prior to 1985, Mrs. Taylor began to advertise, primarily on radio. She stated that the accounts the business landed were the result of her legwork and advertising, and not through the assistance of Novus. (*Id.*)

Evidently, Mrs. Taylor was quite successful in her new endeavor: In her first year

---

1. An average repair job may cost in the neighborhood of $50; the price of replacement usually runs in the hundreds of dollars.

of operation, the business grossed approximately $45,000. (*Id.*, Tr. at 129.) Last year, the business, including both repair and replacement functions, grossed $1.475 million. (David Taylor Testimony, Tr. at 171.)

In 1985, Novus announced that it would be replacing the Methodman II licensing program with a system of franchises. In mid 1986, Mrs. Taylor executed three franchise agreements with Novus—one covering Dauphin and Lebanon Counties and one each covering Lancaster and Cumberland Counties. In early 1987, Mrs. Taylor and her second husband David purchased a "glass shop" for the purpose of making C. Rowe's a full service repair operation: if a windshield was too badly damaged to be repaired, Rowe's could then replace the entire pane. The headquarters of C. Rowe's was moved from the Taylor home to the premises of the glass shop outside of Harrisburg. According to both Mr. and Mrs. Taylor, the move gave them a significant competitive advantage, permitting insurance agents to send their insureds to one location where a diagnosis could be made whether to repair or replace. (C. Rowe Taylor Testimony, Tr. at 138–42; David Taylor Testimony, Tr. at 166–67.)

In the period after Mrs. Taylor's acquisition of the franchise rights, the C. Rowe's business grew rapidly. Rowe's was a heavy advertiser in television, radio, and newspapers, focusing, according to the Taylors, on the C. Rowe business, not on the Novus method. Local advertising for C. Rowe's totaled $286,653 between 1986 and the end of 1991. During this period, Mrs. Taylor attended meetings with the franchisee conventions with the Novus people and also received additional training.

In 1989, Mrs. Taylor executed a fourth franchise agreement, covering six additional counties north and west of Harrisburg: Centre, Union, Snyder, Mifflin, Juniata and Perry counties. C. Rowe's would send employees on day trips to these more remote counties, taking care of a number of jobs per trip.

The dispute from which this lawsuit stems arose in late 1990, when Novus began to collect a national advertising fee from its franchisees equal to 2% of its yearly gross revenues, as authorized by ¶ 5.C of its standard franchise agreement. This language appears in all four of Mrs. Rowe's agreements. At first, C. Rowe's paid the fee. After several months, however, the Taylors began to balk, complaining that they had yet to see any result from the 2% fee and withholding payment. This conflict boiled over in March and April of 1991, when Novus refused to send franchise renewal papers until the fee was paid. When C. Rowe's continued to refuse, the three 1986 franchise agreements lapsed. In August 1991, Novus terminated the fourth franchise agreement for failure to tender the advertising fee.

The disputed advertising spots evidently aired over the radio in the Central Pennsylvania area for a one month period in the summer of 1991. (Testimony of Robin Smith, Novus Corporate Vice–President, Tr. at 65–66).

The franchise agreements signed by Mrs. Taylor contain covenants not to compete, stating that the franchisee will not, after termination or expiration of the agreement, engage in a business which competes with the franchisor for a period of two years in the former franchise territories.

At the hearing, the Taylors admitted that C. Rowe's is still engaged in the business of repairing automobile windshields. Novus has brought the present action to enforce the covenants not to compete and to enjoin Mrs. Taylor and C. Rowe's from engaging the windshield repair business.

*Discussion*

## I. THE GOVERNING LAW

The franchise agreements which are the heart of this matter state that any disputes arising from the contracts are to be governed by the laws of Minnesota. Plaintiff argues that, with regard to the area of covenants not to compete, the laws of Minnesota and the forum state here, Pennsylvania, are virtually identical, and, in fact, plaintiff cites Pennsylvania law extensively in making its arguments.

Defendant disagrees and asserts that Pennsylvania law applies at least to the restrictive covenant. (However, defendant too cites both Pennsylvania and Minnesota law in her opposition brief.) Defendant argues that, under Pennsylvania conflict of laws rules, Pennsylvania law should control at least the covenants because they are aspects of the contracts which control the "commercial trading rights of a Pennsylvania citizen" and because the franchise agreements were to be performed in Pennsylvania.

The court is satisfied that the choice of law clauses in the four franchise agreements control which law, that of Minnesota or Pennsylvania, will apply. However, traditional choice of law rules are essentially irrelevant here, given the choice of law clauses in the franchise agreements. A choice of law provision in a contract is given effect so long as the transaction bears a reasonable relationship to the state whose law is governing. *Churchill Corp. v. Third Century, Inc.*, 396 Pa.Super. 314, 578 A.2d 532, 537 (1990) (choice of law clause discussed in a sale of goods context); *Instrumentation Assocs., Inc. v. Madsen Elecs. (Canada) Ltd.*, 859 F.2d 4, 5–6 (3d Cir.1988).

The law of Minnesota will control the substantive law as it applies to interpreting the franchise agreements. However, as both parties appear content to do so and in the interest of convenience, the court too will cite both Pennsylvania and Minnesota law for the sake of convenience. However, in case of a conflict, the court will defer to Minnesota law.

## II. EQUITABLE DEFENSES

Defendant has raised several equitable defenses which she contends deprive plaintiff of its ability to obtain an injunction.

### A. Laches

 Laches is a doctrine which empowers a court sitting in equity to deny relief to a plaintiff where that plaintiff has inexcusably sat on his rights. *See EEOC v. Great Atlantic & Pacific Tea Co.*, 735 F.2d 69 (3d Cir.), *cert. dismissed*, 469 U.S. 925, 105 S.Ct. 307, 83 L.Ed.2d 241 (1984). Defendant alleges that Novus inexcusably delayed, to her detriment, bringing this action. The court does not agree. First, the delay was not a long period—only four months between termination of the fourth franchise agreement and the institution of this suit. Second, the essentially undisputed testimony was that there were continuing discussions between the Taylors and Novus with regard to C. Rowe's climbing back on board as a Novus franchisee. Moreover, during this period affidavits presented with plaintiff's motion establish that plaintiff was investigating whether C. Rowe's was continuing to use Novus' service marks.

The court sees no undue delay by plaintiffs in bringing this action, and, in fact, this court would encourage conciliation between parties prior to the filing of a legal action. Certainly the court would not penalize Novus for doing so here.

### B. Unclean Hands

 The concept of unclean hands may be employed by a court to deny injunctive relief where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party. *Castle v. Cohen*, 676 F.Supp. 620, 627 (E.D.Pa.1987), *aff'd in part and remanded*, 840 F.2d 173 (3d Cir.1988). Defendant contends that plaintiff is knocking on the door of this courthouse with unclean hands and asserts that Novus' motives are "questionable" in seeking injunctive as opposed to legal relief.

The court has seen absolutely no evidence demonstrating that plaintiff is guilty of fraud, unconscionability or bad faith or any variation on that theme. Moreover, as discussed in greater detail later in this memorandum, the court agrees with defendant that its remedy at law is not adequate. Accordingly, the court rejects defendant's argument that plaintiff has unclean hands.

## C. Adequate Remedy at Law

The court will discuss this issue *infra* at § IV.A.2.

## III. THE PRELIMINARY INJUNCTION

### A. General Standards

In *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223 (3d Cir.1987), the Third Circuit Court of Appeals enumerated the standards for issuance of a preliminary injunction:

> At the trial level, the party seeking a preliminary injunction bears the burden of producing evidence sufficient to convince the court that (1) the movant has shown a reasonable probability of success on the merits; (2) the movant will be irreparably injured by denial of relief; (3) granting preliminary relief will not result in even greater harm to the other party; and (4) granting preliminary relief will be in the public interest.

*ECRI*, 809 F.2d at 226 (citation omitted). While the four factors create the boundaries of the court's inquiry with regard to the issuance of an injunction, no one factor is determinative of the outcome. The factors should be balanced to ensure an equitable outcome. *Philadelphia Council of Neighborhood Orgs. v. Adams*, 451 F.Supp. 114, 116 (E.D.Pa.1978). The court will address each factor as it applies to the present case in turn.

### 1. *Likelihood of Success on the Merits*

■ The seminal Pennsylvania case outlining the law of restrictive covenants as applied to franchising arrangements is *Piercing Pagoda, Inc. v. Hoffner*, 465 Pa. 500, 351 A.2d 207 (1976). In *Piercing Pagoda*, the Pennsylvania Supreme Court indicated that non-competition clauses in franchise agreements would be upheld providing:

> 1) that the clause relates to a contract for the sale of goodwill or other proprietary business interest;
>
> 2) that the clause is supported by sufficient consideration; and

3) that the restriction is reasonably limited in time and geography.

*Piercing Pagoda*, 351 A.2d at 210, 212.[2] *See also Webb Publishing Co. v. Fosshage*, 426 N.W.2d 445, 449 (Minn.App.1988) (applying these factors to an employment agreement). To be valid, however, the covenant must be ancillary to the main agreement—the restrictive covenant tail may not wag the franchise agreement dog. *United States v. Addyston Pipe & Steel Co.*, 85 F. 271 (6th Cir.1898), *aff'd*, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899).

The restrictive covenant, which appears at ¶ 13 in the four franchise agreements involved in the present dispute, reads in pertinent part as follows:

> [Franchisee] ... agree(s) that for a period ... of two (2) years from the date of termination ... [Franchisee] ... will (not) directly or indirectly ... engage in any business ... which business is engaged a business the same as or substantially similar to any one or more of [Franchisee's] business [sic] licensed under this agreement ... within the authorized area; nor shall [Franchisee] ... seek to service or solicit potential customers of [Franchisor] and/or [Franchisor's Franchisees] within the foregoing geographical radius during said two (2) year period.

The court is satisfied, under the preliminary record before it, that the restrictive covenant at issue here is likely to be held valid and enforceable against Mrs. Taylor.

■ With regard to the first *Piercing Pagoda* requirement, defendant has "[b]y the use of franchisor's name and ability the franchisees availed themselves of the beneficial provision of the franchise contract." *Piercing Pagoda*, 351 A.2d at 211. As a Novus franchisee, Mrs. Taylor received training, equipment and inventory from Novus. In addition, she received at least some referrals from national insurance companies and trucking fleets due to the

---

**2.** The *Piercing Pagoda* court pointed out that it previously had upheld restrictive covenants in two other types of cases: those involving employee contracts, *see, e.g., Maintenance Special-* *ties, Inc. v. Gottus*, 455 Pa. 327, 314 A.2d 279 (1974), and those involving the sale of a business, *see, e.g., Morgan's Home Equip. Corp. v. Martucci*, 390 Pa. 618, 136 A.2d 838 (1957).

efforts of Novus, although the number and value of these referrals appears to be in dispute.[3] Third, defendant was permitted under the franchise arrangement to use the patented Novus repair system and the Novus trade and service marks to promote her business. From the testimony presented at the hearing, the court believes that the Novus name and method, while perhaps not carrying with it the instant consumer recognition of Coca–Cola, nevertheless presents a name which is known in the windshield repair field and carries a certain quantum of value and goodwill. (Lynn Kuhn Testimony, Tr. at 11–12; Smith Testimony, Tr. at 34–35.)

The second requirement—that there be sufficient consideration for the covenant—does not appear to be disputed by defendant here.

■ The court now turns to the third *Piercing Pagoda* criterion, whether the limitations imposed by the agreements—geographic, temporal or otherwise—are reasonable. The court is satisfied that they are. The two year period at issue here was explained by Mr. Smith to be necessary for Novus to seek, train, and bring up to speed replacement franchises—a process which could be made much more rigorous by the existence of a former franchisee relying on residual goodwill while part of the Novus fold. (Smith Testimony, Tr. at 55–58.)

Defendant scoffs at this representation, and argues that Novus is only trying to "leech" off Rowe's independently earned reputation in Central Pennsylvania.

Plaintiff's argument makes intuitive sense to the court; defendant's counterargument is mostly irrelevant. The court has no doubt that much of the success of C. Rowe's stemmed from the business acumen and hard work of Mr. and Mrs. Taylor. However, in any arrangement where a non-competition clause is likely to be enforced—an employment contract for instance—there is an expectation by both parties to the contract that the employee or franchisee will act to promote the greatest gain for herself and for the employer or franchisor. When the contract is terminated and the non-competition clause is enforced, courts have recognized that there will necessarily be an extinguishment of some good will the employee or franchisee built up on her own. The courts enforce the covenants nonetheless. *See Boldt Mach. & Tools, Inc. v. Wallace*, 469 Pa. 504, 366 A.2d 902, 905 (1976) ("employer has a protectible interest in the customer goodwill developed by its employees"); *Webb Publishing Co. v. Fosshage*, 426 N.W.2d 445, 449 (Minn.App.1988).

Importantly, two year non-competition limitations have traditionally been upheld by both Pennsylvania and Minnesota courts as reasonable. *See Boldt Mach. & Tools, Inc. v. Wallace*, 469 Pa. 504, 366 A.2d 902, 908 (1976) (five year restriction in employment contract of former salesman of industrial equipment deemed to be reasonable); *John G. Bryant Co. v. Sling Testing & Repair Co.*, 471 Pa. 1, 369 A.2d 1164 (1977) (three year restrictive covenant in an employment agreement held to be reasonable); *Ross v. Houck*, 184 Pa.Super. 448, 136 A.2d 160 (1957) (five year covenant attached to sale of business enforced); *Webb Publishing Co. v. Fosshage*, 426 N.W.2d 445 (Minn. App.1988) (18 month restriction in an employment contract found to be reasonable).

The reasons for the geographic limitation—no operation in former franchise territories—in the franchise agreements here is obvious: to give Novus time to develop new, reasonably competitive franchises in those areas formerly occupied by the departed franchisee. Again, there is no indication that these restrictions are overbroad. C. Rowe's could, if it so desired, operate a business in York county, a fifteen minute drive from its present location outside of Harrisburg. As with the time limitation, restrictive covenants limited to a franchisee's former territories have been

---

**3.** At the hearing, Mr. Taylor indicated that he believed that C. Rowe's received about six referrals per year due to the efforts of the franchisor (Tr. at 17); Novus representative Smith in contrast placed a great deal of emphasis on Novus' activities in contacting and selling to the headquarters of large insurance companies.

held to be reasonable. *See Boldt Mach.*, 366 A.2d at 908; *Wainwright's Travel Serv., Inc. v. Schmolk*, 347 Pa.Super. 199, 500 A.2d 476, 479 (1985); *Overholt Crop Ins. Serv. Co. v. Bredeson*, 437 N.W.2d 698 (Minn.App.1989).

█ Defendant argues that the covenants involved here were not "merely ancillary" to the franchise agreements, and that they were, in reality, the *raison d'etre* for the agreements in the first place. The court does not agree. The *Piercing Pagoda* court, quoting the Sixth Circuit Court of Appeals in *United States v. Addyston Pipe & Steel Co.*, 85 F. 271 (6th Cir.1898), *aff'd*, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899), characterized the "merely ancillary" rule as follows:

> The very statement of the [ancillary] rule implies that the [restraint] must be one in which there is a main purpose, to which the covenant in restraint of trade is merely ancillary. The covenant is inserted only to protect one of the parties from the injury which, in the execution of the contract or enjoyment of its fruits he may suffer from the unrestrained competition of the other. The main purpose of the contract suggests the measure of protection needed, and furnishes a sufficiently uniform standard by which the validity of such restraints may be judicially determined.... But where the sole object of both parties in making the contract as expressed therein is merely to restrain competition, and enhance or maintain prices, it would seem that there was nothing to justify or excuse the restraint, that it would necessarily have a tendency to monopoly and therefore would be void.

*Piercing Pagoda*, 351 A.2d at 211 (quoting *Addyston Pipe*, 85 F. at 282–83).

There has been absolutely no evidence presented that the main purpose behind the Novus franchise networks and the contracts it employs with franchisees was to restrain trade or to maintain artificially inflated prices. It seems clear from the testimony adduced from all the witnesses at the hearing that the Novus franchise operation works thusly: Novus sells its name and service marks, training, equipment and patented techniques, and (at least to some extent) national sales power to various franchisees around the country. In return, Novus gets a percentage of the franchisees' gross revenues. The court was satisfied by Robin Smith's explanation that protection of quality standards and the Novus name, as well as easing the way for replacement franchises into the market, were the reasons for the inclusion of the non-competition clauses in the franchise agreements. (Smith Testimony, Tr. at 55–60.) Defendant produced no evidence to the contrary other than suggesting that the effect of the restrictive covenants was anti-competitive. However, if the main purpose of the clauses in Mrs. Taylor's agreements was to squelch competition, they were not particularly effective—the glass repair field in the central Pennsylvania area is apparently crowded with competitors, while enforcement of the Novus clauses against C. Rowe's knocks out but one competitor. The court has no doubt, therefore, that the restrictive covenants were ancillary to the contracts.[4]

█ Defendant then floats out the argument that it is possible that the fourth franchise agreement was not properly terminated, as defendant's letter may have violated the specificity provisions of Minnesota's franchise law, Minn.Stat.Ann. § 80C.14. The court has reviewed the statutory section in question, as well as the letter of termination and the events surrounding termination. The court concludes that it was clear not only what the dispute was that led to the termination, i.e., the non-payment of the 2% fee, but also the amount owed. Defendant's citation of *Culligan Int'l Co. v. Culligan Water Conditioning of Carver Co.*, 563 F.Supp. 1265 (D.Minn.1983) is, as pointed out by plaintiff in its reply brief, inapposite. The defen-

4. Defendant also appears to argue that plaintiff breached the franchise agreements first by failing to file an accounting with regard to the 2% fee. The record is entirely undeveloped on this point, and, in fact, there is no documentary evidence that defendant complained at the time or that this omission incited her decision not to pay the fee.

dant in *Culligan* disputed the amount due and repeatedly requested an itemized statement. The court found that a franchisee had a right to specific notice of its delinquencies so that it could, if possible, cure them. Here, there is no such confusion over the reason for termination or the amount involved: defendant was well aware of the reason for termination.

Defendant also argues that a provision from Minnesota's antitrust law, which makes illegal a "contract ... in unreasonable restraint of trade or commerce ...," Minn.Stat.Ann. § 325D.51, or Pennsylvania's law on unreasonable restraints of trade, invalidates enforcement of the restrictive covenant at issue here. As restrictive covenants are routinely enforced under both Pennsylvania and Minnesota case law in circumstance similar to those here, the court believes that the cited antitrust and trade laws have no applicability here.

### 2. *Irreparable Harm*

 As stated earlier in this memorandum, plaintiff argues that it will suffer irreparable harm in the form of: 1) difficulty in attracting new franchisees to fill the void left by C. Rowe's departure and 2) protection of corporate reputation and goodwill against unmonitored work performed by C. Rowe's, which may still be identified as a Novus franchisee in the minds of many potential customers.

Novus cites an Ohio district court case, *Economou v. Physicians Weight Loss Centers of America, Inc.*, 756 F.Supp. 1024 2 Bus. Franchise Guide (CCH) ¶ 9771 (N.D.Ohio 1991) as support for its contention that damage to goodwill by a former franchisee may constitute irreparable harm. The *Economou* court recognized that irreparable harm may be present where a franchisee/franchisor relationship is about to break up: "[T]he purpose of the covenants is to protect against loss of control of reputation, loss of good will, and consumer confusion. In general, the courts have held these are sufficient grounds for a finding of irreparable injury." *Economou*, 756 F.Supp. at 1039 ¶ 9771 at 22,002 (citations omitted). The court found that a competing former franchisee, which had "gained knowledge and experience from the franchisor" and could use this knowledge and experience to "serve former or potential customers of the franchisor" would work a severe prejudice on the franchisor which would be difficult to measure through monetary damages. *Id.* at 1032, at 21,996.

Courts in Pennsylvania have recognized this principle as well in the employment contract setting. *See John G. Bryant Co. v. Sling Testing & Repair, Inc.*, 471 Pa. 1, 369 A.2d 1164, 1167 (1977) (consequences of interference with customer relationships may be unascertainable and not capable of being fully compensated by money damages); *Bettinger v. Carl Berke Assocs., Inc.*, 455 Pa. 100, 314 A.2d 296, 298–99 (1974) ("The contract in question did not state that [employer] was limited to the single remedy of damages, nor would it be logical that such would be the case. [Employer] was seeking protection from [employee's] competition and this would not be afforded by damages only").

In the present case, the court is satisfied that Novus has cultivated a valuable interest its own brand name and in the connection of that name with the C. Rowe's business, an interest which will suffer should C. Rowe's operate in competition with Novus in contravention of the franchise agreements.

First, the court believes that Mrs. Taylor and C. Rowe's Windshield Repair did receive value in exchange for franchise status from Novus. There is no dispute that Mrs. Taylor received her training and equipment through Novus, and that prior to that she had been a former nurse with no practical business experience nor expertise in windshield repair. (Cynthia Taylor Testimony, Tr. at 125.) Evidently, there were other methods, such as inexpensive home repair kits, available on the market; however, Mrs. Taylor chose to become affiliated with Novus. (Smith Testimony, Tr. at 84.) In addition, Mrs. Taylor was the recipient of some degree of benefit from her affiliation with Novus—from a newspaper article prompted by the Novus public

relations department to referrals from national clients to exploitation of the "no deductible" scheme. (David Taylor Testimony, Tr. at 164; Smith Testimony, Tr. at 35–36, 84–85.)

Second, the court is satisfied that the Novus name and reputation has value and that C. Rowe's has, to some extent, become affiliated with the Novus name.[5] For instance, the "Novus" service mark is featured prominently in C. Rowe's Yellow Pages ad[6] and there is evidence in the form of affidavits that C. Rowe's continued to represent itself as a Novus affiliate long after its franchisee status had lapsed.[7] In addition, the testimony of Lynn Kuhn indicated that Ms. Kuhn was reluctant to purchase a Novus franchise due to the fact that potential customers still perceived C. Rowe's as a Novus dealer. (Lynn Kuhn Testimony, Tr. at 11.) This connection could 1) scare off potential franchisees, 2) possibly hurt Novus' reputation because of its inability to control quality, and 3) cause confusion among former customers who may desire Novus service. *Id.*

The court concludes that Novus would be in danger of suffering damage to its goodwill and its ability to compete effectively in the Central Pennsylvania market absent enforcement of the restrictive covenant. Although some of the damages involved here may be measurable in monetary terms others—such as damage to goodwill—are too nebulous to ascertain.

### 3. *Harm to Defendant vs. Harm to Plaintiff*[8]

Mrs. Taylor asserts that C. Rowe's would suffer grievous harm in two major respects should the injunction issue: Lays offs of approximately half her staff and the withering of her replacement business without the capacity to repair.

First, she claims that all repair technicians would have to be laid off, resulting in 10 employee lay offs and a scale back in hours of two employees. (David Taylor Testimony, Tr. at 175–76.) Second, as window repair and replacement go hand in hand, the windshield replacement business will suffer greatly should C. Rowe's be

5. The fact that Mrs. Taylor opted to purchase the franchises for *four* counties in 1986 when the restrictive covenants in her existing Methodman II contract covered only *two* counties undercuts her contention that the Novus brand name was worth little to her business. This discrepancy is widened when one considers that the franchise agreement which added the six counties north and west of Harrisburg in 1989 was executed over nine years after she had first become affiliated with Novus. Mrs. Taylor could have operated in those counties without interference had she opted to allow her existing franchises (or, in 1986, the Methodman contract) to expire, as the restrictive covenant would not have reached those counties. Mrs. Taylor admitted that she had obtained the six county franchise not because she was forced to but because she "wanted to be with a reputable company and to continue to do the good work and the service that I had been able to do in the past." (Cynthia Taylor Testimony, Tr. at 136.)

This point is underscored by Mr. Taylor's testimony that he complained to the Novus Service representative in Minnesota that a former "Methodman II" dealer in Boiling Springs, Pennsylvania was featuring a Novus sign even though he was no longer affiliated with Novus. (Tr. at 175.) If the Novus brand name was of small value to C. Rowe's, then why take the time to complain about the use of the brand name by a non-franchisee?

6. The court is aware that the ad was placed prior to Rowe's nonrenewal/termination as a franchisee. Nevertheless, the ad will continue to run.

7. There were submitted with plaintiff's motions affidavits from individuals who had telephoned C. Rowe's in December 1991 and were informed that C. Rowe's used the Novus method, even though the franchise had long since lapsed. In addition, the shop continued to display Novus signs and plaques. (Affidavits of Brent L. Stine and Barry W. Ryan.)

8. Novus' corporate representative, Robin Smith, filed, through counsel, an affidavit supplementing his testimony at the hearing and rebutting certain claims made by Mrs. Taylor and her husband. This prompted a letter from defendant's counsel, pointing out that the submission of the affidavit was improper. The court agrees. Mr. Smith could have stayed, if he so desired, for the two or so hours of testimony that constituted defendant's case, then resumed the stand to give his rebuttal, subject, of course, to defendant's cross examination. Instead, "pressing business" drew him away and he submitted testimony for the consideration of the court without defendant having the benefit to probe him on his contentions. Mr. Smith's supplemental affidavit is not properly before the court and the court therefore will not consider its contents in deciding this motion.

enjoined from repair work. Insurance agents, large consumers of the repair service, prefer to send their customers to an establishment which will permit them "one stop shopping:" if the windscreen can't be repaired, the shop can replace it. (Strock Testimony, Tr. at 118–19.)

The court, while sympathetic to defendant's claim of hardship, does not feel that the circumstances surrounding this hardship outweigh the harm to plaintiff. With regard to Mrs. Taylor's argument that an injunction would work a detriment on the employees who would be immediately laid off, the court, while regretting this result, does not feel that it is, as a legal matter, sufficient to halt the issuance of this injunction. As an initial point, it is not clear to the court that C. Rowe's could not expand its existing glass replacement and customizing business or expand the windshield repair business into a county such as York which the previous franchise agreements did not cover, which could potentially provide sufficient activity for at least some of these employees. Even assuming that the draconian measure of massive layoffs would be immediately necessary, there is no evidence in the record to show that these employees could not find employment either with other windshield repair shops or in other fields. Importantly, the court would like to note that it finds it somewhat unseemly that an employer would apparently breach an agreement (there is no dispute that defendant refused to pay the 2% advertising fee as dictated by the franchise agreements) [9] resulting in the loss of franchise rights, and then claim that the harm to employees resulting from the enforcement of the agreements should deny plaintiff injunctive relief. [10]

Turning to defendant's assertion that the replacement business will wither without the repair business, the court finds that while this may be true to an extent, it would appear that C. Rowe's should be able to survive the 14 month period sans repair capability. 82 percent of C. Rowe's income originates from non-repair glass work. There is no reason why Mrs. Taylor could not direct her energies at expanding this portion of the business, including the installation of sunroofs, crafting of storm windows, etc., even while some portion of the windshield replacement business may be diminishing. Last, the court sees no reason to conclude that all of C. Rowe's replacement business would dry up. While there is certainly some appeal in the one stop shopping theory, even the insurance agent Mrs. Taylor had asked to testify admitted on cross examination that he used quarter sized dent as the rule of thumb for opting for repair versus replacement. (Strock Testimony, Tr. at 122–23.) Accordingly, C. Rowe's could pursue with even more vigor the more lucrative business of replacing windshields which obviously cannot be repaired.

The court, in analyzing the potential damage to defendant, does not mean to demean the loss of jobs or the almost certain drop in income to C. Rowe's. However, given the circumstances surrounding the lapsing of the franchise agreements and the enforcement of the restrictive covenants, the court cannot say as a legal matter that the harm to defendant outweighs the harm to plaintiff.

### 4. The Public Interest

Mrs. Taylor argues that the public interest is best served by free competition and access to markets. High courts in Pennsylvania and Minnesota have determined, however, that protecting the interests in goodwill of employers and franchisors as embodied in non-competition clauses outweighs this interest. This court will follow that long-established line of authority.

## IV. CONCLUSION

The court is of the opinion that all four factors necessary for the issuance of a

---

9. This factual conclusion, as with any factual conclusion made in connection with this injunction, is merely preliminary and is not binding with regard to any future proceedings in this action.

10. The Pennsylvania Supreme Court has noted that a potential loss of employment does not rise to the level of "irreparable harm" for the purposes of the issuance of an injunction. *Novak v. Pennsylvania*, 514 Pa. 190, 523 A.2d 318, 320 (1987).

preliminary injunction weigh in plaintiff's favor. Although it does not do so with great joy, the court will issue an injunction ordering defendant Cynthia Taylor t/a C. Rowe's Windshield Repair to cease and desist any windshield repair operations in Dauphin, Cumberland, Lebanon and Lancaster counties until April 31, 1993 and in Snyder, Centre, Mifflin, Union, Juniata and Perry counties until August 16, 1993.

The court will not grant plaintiff's request that C. Rowe's be forced to turn over its telephone numbers, nor will it direct C. Rowe's to produce an accounting. The court is of the opinion that the accounting will be more appropriate to determine the award of damages at the appropriate time, if necessary. With regard to the turning over of the telephone numbers, the court believes that such relief would give plaintiff more than it had bargained for in the franchise agreements.

### ORDER

In accordance with the accompanying memorandum, IT IS HEREBY ORDERED THAT:

1) Plaintiff's motion for a preliminary injunction is GRANTED;

2) Defendant and her agents are enjoined from:

a) Entering into or engaging in any business individually or in concert with any person or entity, as an investor, lender, shareholder, director or principal, agent, proprietor, partner, consultant, employer, or employee, which business performs windshield repair or scratch removal services in the Pennsylvania counties of Cumberland, Lancaster, Dauphin or Lebanon, before April 30, 1993, and in the Pennsylvania Counties of Perry, Juniata, Mifflin, Union, Snyder and Centre before August 16, 1993;

b) Aiding, abetting, encouraging, or inducing any other parties to do any of the aforementioned acts; and

c) Affecting assignments or transfers, forming entities or associations, or utilizing any other device for the purpose of circumventing or otherwise avoiding the aforementioned prohibitions.

3) Pursuant to Federal Rule of Civil Procedure 65, plaintiff is directed to file a bond with the clerk in the amount of $250,000 pending final disposition of this action.